COMMUNITY AND ECONOMIC DE-
VELOPMENT ASSOCIATION OF
COOK COUNTY, INC., Plaintiff-Appel-
lant,

v.

SUBURBAN COOK COUNTY AREA
AGENCY ON AGING and South Subur-
ban Council on Aging, Defendants-Ap-
pellees.

No. 84–2175.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1985.
Decided Aug. 14, 1985.

Joseph F. Handler, Chicago, Ill., for plaintiff-appellant.

Robert A. Creamer, Keck, Mahin & Cate, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, ESCH-BACH, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

The primary question presented in this appeal is whether there is an implied private right of action under § 501(b) of the Comprehensive Older Americans Act Amendments of 1978, as amended in 1981, that would allow an "existing" service provider to obtain judicial review of an administrative decision denying the provider's application for a grant of federal funds and awarding the grant to another provider. For the reasons stated below, we conclude that there is no implied private right of action in favor of existing service providers under § 501(b). The decision of the district court will therefore be affirmed.

I

Under the Older Americans Act of 1965 ("OAA" or "Act"), 42 U.S.C. § 3001 *et seq.*, the federal government provides assistance to states for the development and administration of a comprehensive system of services for the elderly.[1] The Administration on Aging ("AoA"), which is part of the Department of Health and Human Services, is responsible for the administration of the OAA at the federal level.[2] Under Title III(C)(1) of the Act, funds are specifically provided for "congregate nutrition services."[3]

In order to participate in the OAA programs, a state must designate a state agency that will be responsible for the develop-ment and administration of a state plan. The state must also agree to divide the state into planning and service areas and to designate a public or private nonprofit organization as the "area agency" for each planning and service area.[4]

The state plan, which must be submitted to the AoA for approval, must meet certain eligibility criteria, some of which relate to the provision of nutrition services.[5] If the AoA determines that a state has failed to comply with those provisions of the Act governing state plans, the AoA may notify the state that no further funding will be forthcoming until the failure to comply has been corrected. *See* 42 U.S.C. § 3027(d). After such notification, the state must be given an opportunity for a hearing before the AoA, *see id.* § 3027(c), and may seek review of the final administrative action in the appropriate United States Court of Appeals, *see id.* § 3027(e). The Act also provides that the state agencies "will afford an opportunity for a hearing upon request . . . to any provider of a service [ ] or to any applicant to provide a service under [a state] plan." *id.* § 3027(a)(5); *see also* 45 C.F.R. § 1321.51 (1984).

Section 501(b) of the Comprehensive Older American Act Amendments of 1978,[6] as amended by the Older American Act Amendments of 1981,[7] codified at 42 U.S.C. § 3045 note, provides that:

> No contract awarded after September 30, 1982, shall be entered into for the provision of nutrition services unless such contract has been awarded through a competitive process. Whenever there is

---

1. *See* 42 U.S.C. §§ 3001, 3003; 45 C.F.R. tit. XIII, subch. C (1984).

2. *See* 42 U.S.C. § 3011.

3. "Congregate nutrition services" include meals served in a group setting at a designated food site, along with nutrition education and other services. 42 U.S.C. § 3030e; *see also* 42 U.S.C. § 3027(a)(13); 45 C.F.R. § 1321.141–.147 (1984).

4. *See* 42 U.S.C. § 3025.

5. *See* 42 U.S.C. § 3027. "Area Plans" are covered by 42 U.S.C. § 3026.

6. P.L. No. 95–478, tit. V, § 501(b), 92 Stat. 1513, 1558.

7. P.L. No. 97–115, § 14, 95 Stat. 1595, 1608. Section 501(b) was again amended by the Older Americans Act Amendments of 1984, P.L. No. 98–459, tit. VIII, § 801(b), 98 Stat. 1793. For a description of this latest amendment, see H.R. Rep. No. 737, 98th Cong., 2d Sess. 27 (1984) and H.R.Conf.Rep. No. 1037, 98th Cong., 2d Sess. 48 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad. News 3019, 3036.

no evidence of improved quality of service and cost effectiveness on the part of another bidder, a provider of services who received funds under title VII of the Older Americans Act of 1965 as in effect on September 29, 1978, shall be given preference.[8]

The designated state agency in Illinois under the OAA is the Illinois Department on Aging ("IDOA").[9] Defendant Suburban Cook County Area Agency on Aging ("SCCAAA") is a private, not-for-profit organization designated as the area agency for suburban Cook County, Illinois. Plaintiff Community and Economic Development Association of Cook County, Inc. ("CEDA") is "a provider of services who received funds under title VII of the Older Americans Act of 1965 as in effect on September 29, 1978" within the meaning of § 501(b) (*i.e.*, an "existing" provider) and had been the exclusive service provider of congregate nutrition services at various sites within SCCAAA's jurisdiction. Defendant South Suburban Council on Aging ("South Suburban") is also a service provider within SCCAAA's jurisdiction.

CEDA and South Suburban both submitted bids for fiscal year 1984 to SCCAAA for providing congregate nutrition services at a site in Harvey, Illinois. SCCAAA ultimately awarded the grant to South Suburban in June 1983. CEDA filed an appeal with the SCCAAA Board of Directors, which on July 29, 1983, affirmed the original grant to South Suburban. CEDA then petitioned the IDOA for a reversal of the SCCAAA grant decision. The state agency sustained the grant on September 27, 1983. Thereafter, CEDA filed an action in federal district court in which it claimed that the grant to South Suburban was a violation of § 501(b), because the contract had not been awarded through a competitive process and because CEDA had not been given a preference as an existing provider. The district court concluded that CEDA had no

private right of action under § 501(b) and, therefore, dismissed the complaint for failure to state a claim. CEDA now appeals.

## II

■ At another time, federal courts, relying primarily on common-law tort principles, generously conferred rights of action on private litigants. *See, e.g., J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); *cf. Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.") (quoting 3 W. Blackstone, Commentaries *23). However, since the Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), implied private rights of action have been doled out parsimoniously, and it is now clear that the maxim *ubi jus ibi remedium* no longer pertains in the construction of federal legislation. To the contrary, the ultimate question under current law is whether the legislature *intended* to provide an implied right of action. *See Massachusetts Mutual Life Insurance Co. v. Russell,* — U.S. ——, ——, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985).

■ It should be noted that, when a statute makes no mention of a right of action, its legislative history is usually silent on the subject. Thus, a rigorous application of the requirement of legislative "intent" could mean that the federal judiciary has simply done away with implied rights of action *sub silentio.* Perhaps it would be more accurate to say that there is now a strong presumption against the creation of private rights of action by implication. As the Supreme Court has explained:

---

8. Title VII was the predecessor of the OAA's current Title III. *See* S.Rep. No. 159, 97th Cong., 1st Sess. 3, 14, *reprinted in* 1981 U.S.Code Cong. & Ad.News 2530, 2532, 2543; *see also* 50 Fed.Reg. 12,942 (1985).

9. *See* Illinois Act on the Aging, Ill.Rev.Stat. ch. 23, ¶ 6101.

[W]hile the absence of anything in the legislative history that indicates an intention to confer any private right of action is hardly helpful to the [plaintiff], it does not automatically undermine his position. This Court has held that the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available. [citations omitted] Such an intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment.

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *see also Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979).

■ The intent of the legislature may be divined through the language of the specific provision, identification of the class for whose particular benefit the provision was passed, the legislative history and purposes of the provision, the existence of express statutory remedies adequate to effectuate that legislative purpose, and the state of the law when the provision was enacted. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 839, 78 L.Ed.2d 645 (1984); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 384–86, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983) (congressional "ratification" of right of action through

failure to modify provision consistently construed to allow for implied private right of action); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 378–79, 102 S.Ct. 1825, 1839–40, 72 L.Ed.2d 182 (1982) (same); *Cannon v. University of Chicago,* 441 U.S. at 699–03, 709, 99 S.Ct. at 1958–61, 1964 (statute deliberately modeled after earlier statute under which private right of action consistently implied). We turn first to the language of § 501(b) specifically and of the OAA generally.

■ Section 501(b) provides that (1) contracts will be awarded through a competitive process and (2) all things being equal, an existing provider will be given a preference. The provision says nothing about a right of action inuring to the benefit of any party. Nonetheless, CEDA argues that § 501(b) was enacted for the *particular* benefit of existing service providers and thus a right of action in their favor may be inferred.[10]

We disagree. The federal government must contract for the services it provides and, from the perspective of CEDA, § 501(b) is simply a government-contract provision. To follow CEDA's argument further, one would have to conclude that a law calling for the construction of new schools was enacted to benefit primarily the construction industry, which would indeed be an unusual result.[11] To the con-

---

**10.** CEDA's frequent citation to *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir. 1970), is unavailing. In *Scanwell,* § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702, was under consideration. That provision confers an *express* right of judicial review on persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." The question presented in *Scanwell* was whether the plaintiff met those statutory requirements and the opinion focused primarily on whether Scanwell had standing. The question in the instant case, however, is whether Congress intended to provide a right of action in the first instance. It should also be noted that *Scanwell* was decided prior to the Supreme Court's decision in *Cort v. Ash.*

**11.** CEDA maintains that the issue of an implied right of action for existing service providers raises a civil-rights question, because it affects

the interests of the elderly, the poor, and minorities. Again, we disagree and would point out that this argument undermines CEDA's claim that service providers are the primary beneficiaries of § 501(b). From CEDA's point of view, this is a bidding dispute and nothing more. It only involves the rights of the elderly, the poor, and minorities *if* CEDA is in fact acting as a "trustee" for the primary beneficiaries. CEDA has not directed our attention to any part of the OAA or its legislative history that would indicate a congressional intent to accord this status to service providers.

Thus, CEDA cannot simultaneously claim that it is the primary beneficiary of § 501(b) *and* that this is a civil-rights dispute. We need not pass on the character of § 501(b), however, as we find that it was not enacted for the benefit of providers and that CEDA cannot act as a trustee for the actual beneficiaries of the Act. We do note, however, that the AoA has concluded that

trary, the interests of service providers are a secondary concern at best. *Cf. Cort v. Ash*, 422 U.S. at 81, 95 S.Ct. at 2089. The primary beneficiaries of the Act are the elderly who may participate in the nutrition programs. *Cf.* 42 U.S.C. §§ 3001, 3003.

In addition, we do not understand how the requirement of a "competitive process" benefits *existing* service providers, especially when the original version of § 501(b) did not require such a procedure. The claim that the "preference" is for the benefit of existing providers is, however, more plausible. Nonetheless, as we read the statute, the preference simply provides a tie-breaking rule: if there is no meaningful distinction in the quality and efficiency of the various bidders, the existing provider will be retained in the interest of stability, quiescence, and administrative convenience.

■ Our conclusion that the language of the OAA and § 501(b) does not indicate an intent on the part of Congress to provide existing service providers with an implied right of action is strengthened by the fact that Congress did expressly accord providers a remedy. As noted above, 42 U.S.C. § 3027(a)(5) requires that service providers be afforded an opportunity for a hearing with the appropriate state agency. *See also* 45 C.F.R. § 1321.51 (1984). Despite this specific reference to service providers, CEDA is asking this court to hold that Congress intended to provide more through an implied right of action than it specifically provided in 42 U.S.C. § 3027(a)(5). The Supreme Court has repeatedly noted that Congress knows how to provide an express remedy. *See University Research Association, Inc. v. Coutu*, 450 U.S. 754, 773, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979). It is the teaching of the most recent pronouncements from the Court that rights of action cannot be inferred without powerful support in the legislative history, especially when other remedies are expressly provided. *See, e.g., Middlesex*

*County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20–21, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981); *Transamerica Mortgage Advisors*, 444 U.S. at 19, 100 S.Ct. at 247; *Touche Ross*, 442 U.S. at 571–74, 99 S.Ct. at 2486–88; *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). As we explain below, such support is lacking in the legislative history of § 501(b).

To understand the legislative history of the current version of § 501(b), it is necessary to consider the original version of the provision. As enacted in 1978, § 501(b) provided that:

> Any project receiving funds under title VII of the [OAA], as in effect on the day before the effective date of this Act, shall continue to receive funds under part C of title III of such Act, as amended by this Act, if such project meets the requirements and criteria established in such title III, as amended by this Act, except that a State, pursuant to regulations prescribed by the Commissioner on Aging, shall not discontinue the payment of such funds to a project unless such State, after a hearing (if requested by the person responsible for administering such project), determines that such project has not carried out activities supported by such funds with demonstrated effectiveness.

In the Senate Report accompanying the 1981 amendments to § 501(b), it was noted that:

> The Committee has heard some complaints that area agencies find it difficult and costly to discontinue contracting with poorly administered nutrition projects because of the protection afforded by this "grandfather clause." In addition, the needs of the elderly far exceed the resources available under the nutrition program, and it is virtually [sic] important that area agencies on aging be

the Act did not establish an entitlement program and has refused to provide the elderly

with a right to a hearing before state or area agencies. *See infra* note 13.

given the freedom to contract with the most effective and efficient providers. S.Rep. No. 159, 97th Cong., 1st Sess. 14, *reprinted in* 1981 U.S.Code Cong. & Ad. News 2530, 2543.

■ This passage indicates that the OAA was enacted for the special benefit of the elderly, that Congress was concerned about the scarce resources available for the nutrition programs, and that it sought to break the control over funding that the original § 501(b) had given existing service providers. Thus, the legislative history strongly suggests that Congress had no intention of providing existing service providers with an implied private right of action, for it would be odd indeed for the legislature to facilitate the removal of existing providers to promote cost-effective service and at the same time to allow existing providers to obtain judicial review of contract awards, while providing no express right of action and leaving § 3027(a)(5) unchanged.[12] Similarly, the implication of a right of action would undermine the express purposes of the 1981 amendments.

■ Congress has struck the balance between the interests of service providers and the other parties affected by the OAA. *Cf. University Research Association,* 450 U.S. at 782, 101 S.Ct. at 1467. The legislature is not required to provide a remedy for every violation of federal law, *see Shepard v. NLRB,* 459 U.S. 344, 351, 103 S.Ct. 665, 670, 74 L.Ed.2d 523 (1983), and the judiciary may not extend the coverage of the OAA simply because it might disagree with the legislature's allocation of rights and remedies. *See University Research Association,* 450 U.S. at 770, 101 S.Ct. at 1461. The implication of a right of action for existing providers under § 501(b) would have a highly disruptive effect on the administration and funding of Title III(C)(1) programs. *Cf. University Research Association,* 450 U.S. at 782–84, 101 S.Ct. at 1467–68. If the Act is to be supplemented for the benefit of existing providers, it must be done by Congress, not the courts. *See Simmons v. Interstate Commerce Commission,* 766 F.2d 1177, 1181 (7th Cir. 1985).

To support its position, CEDA does not even refer to the language of § 501(b) or its legislative history. It relies instead on "interpretations" rendered by the AoA and the IDOA and argues that we must defer to those pronouncements. With reference to the AoA, CEDA cites the regulations promulgated in 1980. Not only do these rules antedate the 1981 amendment to § 501(b), but they also provide no support for CEDA's position. Even though they address the 1978 version of § 501(b), these administrative interpretations make it clear that the AoA concluded that disputes under § 501(b) would be resolved at the state level and proceed no further.[13]

CEDA also refers to the statement in the IDOA's decision in the instant dispute that "This is a final administrative action and the parties hereto may pursue any further relief in an appropriate Judicial Tribunal." Assuming *arguendo* that a state agency's

---

**12.** It should be noted that not all administrative determinations are subject to judicial review. *See, e.g., University Research Association,* 450 U.S. at 761 n. 10, 101 S.Ct. at 1457 n. 10.

**13.** *See* 45 Fed.Reg. 21,133, 21,141 (1980). The following passage is also illuminating: We do not believe it would be appropriate for us to require a State or area agency to provide an opportunity for a hearing to participants or applicants. Title III of the Act is not an entitlement program. State and area agencies must follow certain priorities in selecting older individuals to be served and services to provide, but no older individual is entitled to services under the Act. Furthermore, there is no specific statutory requirement that these

hearings be provided. Of course, a State or area agency would be free under these regulations to impose such a requirement if it chose. *Id.* at 21,133.

If the AoA did not interpret the Act to provide the elderly, who are the primary beneficiaries under the Act, with any more rights than the Act expressly provided, it follows that the agency would not interpret the Act to provide an implied right of action to existing service providers.

It should be noted that "Interim Final Rules" have recently been issued by the AoA, *see* 50 Fed.Reg. 12,942 (1985), but they do not address the requirements of § 501(b).

interpretation of federal legislation is entitled to deference, we nonetheless find that this sentence amounts to nothing more than a boilerplate recitation at the conclusion of the IDOA decision that the "parties" "may" pursue further relief, but that in no way identifies the "appropriate Judicial Tribunal." *Cf.* 89 Ill.Admin.Code § 220.519 (1985). This is not just a slender reed; this is no reed at all.

### III

Because we have found no indication of an intent on the part of Congress to provide an implied private right of action to existing service providers, our inquiry is at an end. *See Massachusetts Mutual,* —— U.S. at ——, 105 S.Ct. at 3093; *Transamerica Mortgage Advisors,* 444 U.S. at 24, 100 S.Ct. at 249; *Osborn v. American Association of Retired Persons,* 660 F.2d 740, 745–46 (9th Cir.1981). The judgment of the district court is AFFIRMED.