## ILLINOIS HEALTH CARE ASSOCIATION, et al., Plaintiffs,

v.

## Susan SUTER, etc., et al., Defendants.

### No. 89 C 849.

United States District Court, N.D. Illinois, E.D.

Aug. 4, 1989.

James J. Casey, Lawrence A. Manson, Keck, Mahin & Cate, Bruce Stratton, Thomas J. Reed, Stratton, Dobbs, Nardulli & Lestikow, Chicago, Ill., for plaintiffs.

Neil F. Hartigan, Illinois Atty. Gen., Owen M. Field, James C. O'Connell, Chicago, Ill., for Suter.

Anton R. Valukas, U.S. Atty., Thomas Walsh, Asst. U.S. Atty., Donna Morros Weinstein, Chief Counsel, Region V, Barbara F. Altman, Carolyn Cozad Hughes, Asst. Regional Counsel, for Sullivan.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Illinois Health Care Association and Heartland Manor Nursing Center, Inc. have sued Illinois Department of Public Aid Director Susan Suter ("Suter") and United States Secretary of Health and Human Services Louis Sullivan ("Secretary")[1] asserting a number of violations of the Medicaid Act ("Act"), 42 U.S.C. §§ 1396–1396s.[2] Both Suter and Secretary are sued only in their official capacities.

Suter and Secretary have filed separate motions to dismiss under Rule 12(b)(6).[3] For the reasons stated in this memorandum opinion and order, Secretary's motion is granted and resolution of Suter's motion is deferred.

---

1. Initially the second-named defendant was then Secretary Otis Bowen ("Bowen"). As a result of Bowen's resignation and Sullivan's confirmation as his successor, Sullivan has automatically been substituted as defendant under Fed.R. Civ.P. ("Rule") 25(d)(1). Because the substitution has no substantive effect on the result, this opinion simply refers to "Secretary" throughout.

2. All further references to the Act (which is Title XIX of the Social Security Act) will take the form "Section—," reflecting Title 42's numbering rather than the Act's internal numbering.

3. Both plaintiffs are represented by the same counsel and accordingly filed a single responsive memorandum to each defendant's motion. Those memoranda will be cited "P. Suter Mem. —" or "P. Secretary Mem.—," depending on the motion to which the memorandum is responding.

*Background and Statutory Framework* [4]

Medicaid is a joint federal-state program under which the United States provides funds to reimburse states in part for programs of public assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services" (Section 1396).[5] States are not required to participate in the program, but if they choose to do so they must comply with the Act and applicable regulations (*Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980); *Wisconsin Hospital Ass'n v. Reivitz*, 820 F.2d 863, 864 (7th Cir.1987) (*"Wisconsin Hospital II"*)).

Until 1980 the Act required a state to reimburse nursing homes for "the reasonable cost of inpatient hospital services provided under" the state's Medicaid plan. Essentially nursing homes were permitted to recover from states their full actual cost of providing inpatient care to Medicaid patients.

But Congress found such "reasonable cost" reimbursement was "inherently inflationary and contain[ed] no incentives for efficient performance" (S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 744; see also 2 H.R.Rep. No. 158, 97th Cong., 1st Sess. 293, reprinted in Medicare & Medicaid Guide (CCH) ¶ 24,486, at 8799–38 (1981)). It therefore replaced that approach with the Boren Amendment,[6] under which a state plan for medical assistance must provide (Section 1396a(a)(13)(A)):

for payment ... of the hospital, skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs and provide, in the case of hospital patients receiving services at an inappropriate level of care ... for lower reimbursement rates reflecting the level of care actually received ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital, skilled nursing facility, and intermediate care facility and periodic audits by the State of such reports.[7]

---

4. Rule 12(b)(6) principles require this Court to accept as true all plaintiffs' well-pleaded factual allegations, drawing all reasonable inferences in their favor (*Marmon Group, Inc. v. Rexhord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). That concept operates in an odd way here, for the Complaint (cited simply "¶ —") contains few truly factual allegations at all. Instead it sets out in some detail the statutory framework underlying this action. Any potential problems in that respect are obviated, however, by the litigants' joint acknowledgement that no real factual disputes separate them—only legal issues.

5. This Court has previously been called on to treat other issues posed by the Act: see *Illinois Hospital Ass'n v. Illinois Dept. of Public Aid [IDPA ]*, 576 F.Supp. 360 (N.D.Ill.1983) and *Children's Memorial Hospital v. IDPA*, 562 F.Supp. 165 (N.D.Ill.1983).

6. That enactment was part of the Omnibus Reconciliation Act ("OBRA") of 1980 (Pub.L. 96–499).

7. [Footnote by this Court] Congress first changed the payment standard for nursing home and intermediate care facilities—not hospitals. Just one year later, as part of OBRA 1981 (Pub.L. 97–35), Congress adopted the identical standard for hospitals (that identity was confirmed by the accompanying Senate Report, S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 Code Cong. & Ad.News 396, 744). Thus the legislative history from both amendments bears on the analysis here. *Illinois Hospital Ass'n*, 576 F.Supp. at 368 n. 11 outlines the legislative changes.

*Colorado Health Care Association v. Colorado Department of Social Services,* 842 F.2d 1158, 1165 (10th Cir.1988) explains the two principal purposes of the Boren Amendment:

> "[F]irst, that the States set their own reimbursement rates without stifling and expensive federal oversight of the methodology used; and second, that Medicaid expenses be reduced by allowing the states to develop payment systems which would encourage efficiency."

Our own Court of Appeals has similarly characterized the Boren Amendment as "provid[ing] for both more stringent cost containment and less federal oversight of state reimbursement methodologies" (*Wisconsin Hospital Ass'n v. Reivitz,* 733 F.2d 1226, 1228 (7th Cir.1984) ("*Wisconsin Hospital I*")).

But state efficiency was not to be achieved at the cost of quality care for the needy. Thus the Senate Report said the desired state fiscal flexibility would not justify "arbitrary reductions in payment that would adversely affect the quality of care" (S.Rep. No. 139 at 478, reprinted in 1981 U.S.Code Cong. & Ad.News at 744), a concern echoed by the House Report (2 H.R.Rep. No. 158 at 293–94, reprinted in Medicare & Medicaid Guide ¶ 24,486 at 8799–35 to –36):

> The Committee believes that hospitals should be paid for the cost of their care to Medicaid patients in the most economical manner. The Committee intends States to recognize that facilities that provide teaching services or other specialized tertiary care services[ ] may have operating costs which exceed those of a community hospital. The Committee is concerned that the reimbursement methods established by the States recognize the need to provide a full range of both primary care and tertiary care services to Medicaid beneficiaries and take into account the differences in operating costs of the various types of facilities needed to provide this broad scope of services. For example, the Committee does not intend that the only facility providing a specific type of treatment, such as treatment of spinal cord injury, not be available to Medicaid beneficiaries because the State's payment level is inadequate to meet the basic cost of care in that facility.

To meet the already-described multiple (and potentially conflicting) goals, Congress emphasized the adequacy of payments so long as the providers of services were efficient (H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 962, reprinted in 1981 U.S. Code Cong. & Ad.News 396, 1324):

> [T]he conferees intend that State hospital reimbursement policies should meet the costs that must be incurred by efficiently-administered hospitals in providing covered care and services to Medicaid eligibles as well as the costs required to provide care in conformity with State and Federal requirements. It also is recognized that States may limit increases to the increases that result from price increases for goods and services purchased by hospitals, as measured by such indices as the national hospital input price index, for example.

House Senate Conference Report to OBRA, reprinted in Medicare & Medicaid Guide (CCH) ¶ 24,407 at 8785–29 added this:

> The conferees would further note their intent that a State not develop rates under this section solely on the basis of budgetary appropriations.

This action's principal—but not sole—focus is the Boren Amendment, codified as Section 1396a(a)(13)(A). That provision is only one component of the Act's complicated scheme. Under Section 1396a each participating state must develop a plan containing a variety of provisions (at least 50 separate requirements are set out in the statute). Besides Boren's Section 1396a(a)(13)(A), three other provisions are relevant here:

> 1. Section 1396a(a)(2) requires the state to "provide for financial participation.... which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan."

2. Section 1396a(a)(30)(A) requires "methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care."

3. Section 1396a(a)(37)(B) requires "procedures of prepayment and postpayment claims review ... to ensure the proper and efficient payment of claims and management of the program."

In turn, Section 1396c requires Secretary "after reasonable notice and opportunity for hearing to the State agency administering ... the State plan" to withhold payment to the State if he finds the plan or the State's administration of the plan does not comply with the Act. Congress expressly provided that Secretary may make rules and regulations necessary to carry out the Act (Section 1302). Those regulations are set out at 42 C.F.R. § 447.

## Positions of the Parties

Plaintiffs' action against Suter mainly charges Illinois' reimbursement rates paid to participating nursing homes are insufficient "to meet the costs which must be incurred by efficiently and economically operated facilities" and thus violate Section 1396a(a)(13)(A). Plaintiffs also claim Suter has violated three earlier-described provisions of the Act—Sections 1396a(a)(2), 1396a(a)(30) and 1396a(a)(37)(B). Suter responds with a three-pronged motion to dismiss:

1. Federal jurisdiction is barred by the Eleventh Amendment.

2. Plaintiffs have no "enforceable rights" under the Act so as to permit suit under 42 U.S.C. § 1983 ("Section 1983").

3. Plaintiffs have failed to state a claim upon which relief can be granted.

Plaintiffs' claim against Secretary focuses on the requirement in Section 1396a(a)(13)(A) that a state must "make[ ] assurances satisfactory to the Secretary"

that its reimbursement rates are reasonable and adequate under the Act. Plaintiffs contend Secretary had reason to know that Illinois' assurances were "inaccurate" (¶ 33(e)), so that Secretary's "approval of Illinois nursing home rates was arbitrary and capricious and in violation of the Medicaid Act" (¶ 31). Secretary has also leveled a three-pronged counterattack:

1. Plaintiffs lack standing to sue Secretary.

2. No private right of action exists under the Act.

3. Plaintiffs have failed to state a claim.

One matter should be made clear at the outset. Plaintiffs' Prayer for Relief seeks, as its only remedy identified in so many words (other than the usual "such other relief ..." catchall), a declaratory judgment that both Suter and Secretary have violated the Act. Neither money damages nor injunctive relief is specifically sought in the Complaint.

## Secretary's Motion

Only one issue needs to be addressed as to plaintiffs' claim against Secretary: the nonexistence of such a private right of action under the Act. That conclusion renders it unnecessary to consider whether plaintiffs would have standing to sue in any event.[8]

*Maine v. Thiboutot,* 448 U.S. 1, 6, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673–74, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974)) held the Social Security Act (of which Medicaid is a discrete part) "affords no private right of action against a State." While the analysis is not precisely the same as to the two levels of governmental sovereignty—state and federal—and while the two statutes might not necessarily compel the same result, *Thiboutot* strongly suggests the outcome here.

P. Secretary Mem. 18 admits the Act does not *expressly* provide for a right of action against Secretary. Plaintiffs nevertheless assert the language and legislative

**8.** See Appendix.

history of the Act suggest Congress intended to grant providers such a right.

On that score the Supreme Court has given an increasingly restrictive reading to *implied* private actions—a substantially more demanding standard than *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) was initially thought to have established. Our Court of Appeals has recently spoken to that point in *King v. Gibbs*, 876 F.2d 1275, 1280, 1281 (7th Cir. 1989):

> The Supreme Court, in *Cort v. Ash*, set out a four-part test to determine whether a private right of action should be implied from a statute:
>
> > First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
>
> 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted).
>
> In its recent pronouncements, the Court has reaffirmed the use of the *Cort* test but has also made it clear that the principal focus is on the second of the *Cort* factors—whether the legislature intended to create a private cause of action. *See Cannon v. University of Chicago*, 441 U.S. 677 [99 S.Ct. 1946, 60 L.Ed.2d 560] (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 [99 S.Ct. 2479, 2485, 61 L.Ed.2d 82] (1979). The first and third of the *Cort* factors are aids in

determining that intent, *Touche Ross*, 442 U.S. at 575–76 [99 S.Ct. at 2488–89]; *see also* P. Bator, D. Meltzer, P. Mishkin, D. Shapiro, *The Federal Courts and the Federal System* 946 (1988), and, by negative implication, it is unclear whether the fourth *Cort* factor—whether the cause of action is generally thought of as a matter of state concern—has any continuing significance. *But see Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 393 [102 S.Ct. 1825, 1847, 72 L.Ed.2d 182] (1982) (Court noted that fourth *Cort* factor favored implying private right of action under a provision of the Commodities Exchange Act.). In sum, unless a congressional intent to create the right of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94 [101 S.Ct. 1571, 1582, 67 L.Ed.2d 750] (1981).

Indeed, *West Allis Memorial Hospital, Inc. v. Bowen*, 852 F.2d 251, 254 (7th Cir. 1988) has put the matter even more bluntly:

> A strong presumption exists against the creation of such implied rights of action.[9]

Not surprisingly (given the lack of an express remedy), nothing in the Act's language even hints at a right to sue Secretary—it is silent as to suits of *any* kind. Nor does the legislative history suggest otherwise: Plaintiffs' memorandum does not identify a single passage from the legislative history to support their assertion.

If anything, the legislative history characterizes Secretary's role as one that does not enmesh him in the details of the States' compliance with the Act (S.Rep. No. 96–

---

**9.** [Footnote by this Court] P. Secretary Mem. 15–16 advances an extraordinarily disingenuous argument in an effort to blunt the force of *West Allis*. Plaintiffs urge that the word "such" refers only to the specific private right of action rejected in that case. But that does violence not only to the normal reading of the quoted language as meaning "all such implied rights of action" in the universal sense, but also to the fact that the

authority *West Allis* cited for that proposition (*Community & Economic Development Ass'n of Cook County, Inc. v. Suburban Cook County Area Agency on Aging*, 770 F.2d 662, 664 (7th Cir.1985)) (1) dealt with a totally different statute (the Comprehensive Older Americans Act Amendments of 1978) and (2) more importantly, contained a discussion of implied rights of action in wholly generic terms.)

471, 96th Cong., 1st Sess., at 29 (1979)) (Appendix to Secretary Mem.):

> The Congress expects that the Secretary will keep regulatory and other requirements to that minimum necessary to assure proper accountability, and not to overburden the States and facilities with marginal but massive paperwork requirements. It is expected that the assurances made by the States will be considered satisfactory in the absence of a formal finding to the contrary by the Secretary.

Thus *Virginia Hospital Association v. Baliles*, 868 F.2d 653, 659 (4th Cir.1989) was surely accurate in saying (in the course of imposing statutory accountability on a State and not on Secretary):

> The legislative history also indicates that Congress intended no close scrutiny by the Secretary of [a State's] assurances of compliance with the mandates of § 1396a(a)(13)(A).

To imply a private right of action against Secretary would require more than the anticipated limited degree of oversight envisioned for Secretary. After all, a congressional expectation that Secretary's promulgation of "regulatory and other requirements" would be kept at the "minimum necessary" level hardly signals an invitation to private parties to sue Secretary for not conducting a chapter-and-verse inquiry into the facts underlying a State's assurances.

In short, allowing a right of action against Secretary would alter the structure of the Act, a point made in dictum in *Rush v. Parham*, 625 F.2d 1150, 1154 n. 5 (5th Cir.1980) (dealing with a claim against Secretary for Georgia's refusal to pay for transsexual surgery):

> Were we to reach the issue, we would be hesitant to find that federal officials owe a duty to particular Medicaid recipients to disapprove a state Medicaid plan that improperly denies them benefits. We have been pointed to no statutory language creating such a duty, and to find one implicit in the overall Medicaid scheme would likely alter the general supervisory responsibilities of the federal government therein.

It is no accident that *Davis v. Ball Memorial Hospital Association*, 640 F.2d 30, 45 (7th Cir.1980) has viewed the implication of a private remedy against the federal government as materially different from allowing an enforcement suit against a State:

> It is one thing to make the patients the direct beneficiaries of the assurances, quite another to give them an immediate interest in the particulars of federal enforcement and administration, which serve the public at large. Put more simply, the interests implicated by an action to compel local compliance with the assurances are different from those implicated by a suit to compel specific action by the Secretary to compel the facilities to comply.

Plaintiffs' principal argument is that as health care providers they are "one of the class for whose benefit the Medicaid Act was enacted" (P. Secretary Mem. 17). Though the Act was aimed at furnishing aid to the needy (Section 1396), some courts have held patients and providers have "parallel interests with respect to Medicaid funding and reimbursement" (see, e.g., *Colorado Health Care Ass'n*, 842 F.2d at 1164 n. 5; *Coos Bay Care Center v. State of Oregon, Department of Human Resources*, 803 F.2d 1060, 1063 (9th Cir.1986)). Plaintiffs argue they thus satisfy the first element of *Cort*'s four-part test—a fact they say militates toward finding a private right of action.

But even if plaintiffs could satisfy the first *Cort* element (and Secretary vehemently disputes that [10]), that would not do

---

**10.** Secretary R. Mem. 3 argues a critical distinction exists between *a* beneficiary of the Act and one "for whose *especial* benefit the statute was enacted" (the emphasis in *Cort*). *Burroughs v. Hills*, 741 F.2d 1525, 1531 (7th Cir.1984) (per curiam) (Judge Nichols writing for the majority in a three-opinion case) has emphasized that same distinction. Because no implied right exists in any event, this Court need not resolve that intellectual problem. It does appear, however, that the "*especial* benefit" notion underscored in *Cort* would not encompass plaintiffs here.

the job. After all, *King* confirms that the first *Cort* factor is only an aid in determining legislative intent—the controlling second factor. And where (as here) plaintiffs can point to nothing that really suggests Congress intended to create a private right of action, that is the end of the inquiry.

In sum, several factors counsel against implying a private right of action here:

1. both (a) the "strong presumption" against such rights articulated by our Court of Appeals and (b) the Supreme Court's general reluctance to imply such rights;

2. the total absence of any indication, either in the statutory language or in the legislative history, of any congressional intent to create such a right;

3. the negative implication arising from *Maine v. Thiboutot's* decision rejecting any implied right to sue a State;

4. the inconsistency between (a) any such implication and (b) the structure of the Act, confirming Secretary's limited role as envisioned by Congress; and

5. the open question whether plaintiffs could qualify as parties for whose *especial* benefit the statute was enacted.

Plaintiffs have not sustained their admitted burden (P. Suter Mem. 10) of demonstrating "an affirmative intent on the part of Congress to create a private right of action." Hence the claim against Secretary must be dismissed for lack of subject matter jurisdiction.[11]

---

**11.** One final note on this issue: Plaintiffs rely heavily (indeed almost exclusively) on *Estate of Smith v. Heckler,* 747 F.2d 583, 589 (10th Cir. 1984) for the proposition that Secretary has an affirmative duty to look behind Illinois' assurances. That is sought to be used as a building block to evidence a congressional intent to allow private parties to sue Secretary to compel his fulfillment of that duty. But *Smith* is not at all parallel to this case. At issue there was Section 1396a(a)(33)(B), which has an explicit "look-behind" provision requiring Secretary to examine the state's assurances (*id.* at 590):

The "look-behind" provision and its legislative history clearly show that Congress intended the Secretary to be responsible for assuring that federal Medicaid money is given only to those institutions that actually comply with Medicaid requirements.

*Suter's Motion*

P. Suter Mem. 12 n. 8 confirms that plaintiffs are suing Suter under Section 1983. In fact, P. Suter Mem. 7–8 admits that Section 1983 is the exclusive statutory vehicle available to them in seeking compliance with the Act—necessarily so given *Thiboutot's* holding that no private right of action exists against a State.[12]

But any Section 1983 claim against a State or its officials acting in their official capacities (as Suter did here)[13] demands analysis of this Term's decision in *Will v. Michigan Department of State Police,* —— U.S. ——, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989):

We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.

Were that sentence truly *Will's* unqualified holding, plaintiffs would be dead in the water. But the Court hedged that flat-out statement by adverting to the familiar fiction that informs *Ex parte Young* and its progeny: that is, the notion that a State cannot act unconstitutionally, so that any State official who violates one's constitutional rights is perforce stripped of his or her official character (and see n. 17). Here is *Will's* hedging footnote (*id.* 109 S.Ct. at 2311 n. 10 (citations omitted)):

Of course a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official capacity actions for prospective relief are not treated as actions against the State." ... This dis-

No such "look-behind" provision (nor any legislative history expressing such an intention) exists here.

**12.** See, e.g., *Silver v. Baggiano,* 804 F.2d 1211, 1215 (11th Cir.1986) and this Court's opinion in *Almond Pharmacy, Inc. v. Mankowitz,* 587 F.Supp. 925, 926 (N.D.Ill.1984).

**13.** By definition a suit against a state officer in his or her official capacity is one against the office as such (*Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985)) and hence no different from a suit against the State itself (*Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985)).

tinction is "commonplace in sovereign immunity doctrine," ... and would not have been foreign to the 19th-century Congress that enacted § 1983....

It is unsurprising that *Will's* four dissenting Justices found difficulties with the majority's intermixture of Eleventh Amendment jurisprudence with the statutory question whether a State is a "person" under Section 1983.[14] But that is now accomplished fact. What remains for determination here is the potential impact of *Will* on plaintiffs' declaratory judgment claim.

How is that problem to be analyzed? Certainly the declaratory judgment claim must be viewed both at and beneath the surface to see what relief plaintiffs really seek.

If the action, so viewed, is in fact one for money damages (that is, if plaintiffs seek a declaration of rights as a springboard for retrospective relief), the claim would be barred for two reasons. Either would be sufficient to defeat plaintiffs.

First, any such retrospective claim is directly blocked by *Will.* If plaintiffs are not seeking exclusively *prospective* injunctive relief, they cannot charge Suter as a Section 1983 "person" under *Will's* footnote 10.

Second, and just as damaging, plaintiffs' claim would be barred by Eleventh Amendment principles. *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979) (citations and footnotes omitted)[15] explains the familiar distinction between retrospective relief (impermissible) and prospective relief (permissible):

> In *Edelman* we reaffirmed the rule that had evolved in our earlier cases that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.... We rejected the notion

that simply because the lower court's grant of retroactive benefits had been styled "equitable restitution" it was permissible under the Eleventh Amendment. But we also pointed out that under the landmark decision in *Ex parte Young,* 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908), a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury.... The distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other.

Thus any retrospective claim, even if sought indirectly via declaratory judgment, is at least doubly barred.

That leaves potentially viable only plaintiffs' claim for declaratory judgment as a vehicle to obtain prospective relief—something akin to a request for a mandatory injunction requiring Suter to change the reimbursement rates for the future. In facial terms such a claim would seem to come squarely within *Will's* footnote 10 exception. But the matter deserves further probing.

If plaintiffs' action here triggers a declaration favorable to them, the resulting mandate to Suter would thrust a major financial burden on the State of Illinois. After all, plaintiffs charge the rates are "inadequate"—the State's budgetary shortfalls have allegedly resulted in arbitrary payment methodologies that produce "a payment rate substantially less than the federal requirement" (¶ 25). Indeed, plaintiffs assert payment rates have not even kept up with inflation (¶ 29).

Plainly plaintiffs want a declaratory judgment solely as a means to achieve their

---

**14.** Justice Brennan, speaking for the dissenters in *Will,* 109 S.Ct. at 2312, put the point this way: Like the guest who wouldn't leave, however, the Eleventh Amendment lurks everywhere in today's decision and, in truth, determines its outcome.

**15.** *Will,* 109 S.Ct. at 2309 n. 6 rejects one of the petitioner's arguments there as "no more than an attempt to have this Court reconsider *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), which we decline to do."

desired end: increased reimbursement rates. And in terms of what is before this Court, that would substantially impact the state budget, for nothing in the Complaint suggests a zero-sum situation exists here (such that an increase in the State's payment rates to plaintiffs would be offset with a decrease elsewhere). But that raises at least a question: If the reason a State cannot be sued under Section 1983 is the bar against invading the sovereign's fisc without its consent, does the same reason inhibit a declaratory judgment whose direct consequence would be an identical financial drain?

Less than two weeks ago this Court addressed that very issue in *Artist M. v. Johnson,* No. 88 C 10503, slip op. at 6, 1989 WL 88525 (N.D.Ill. July 24, 1989):

> But will that Eleventh Amendment parallel extend chapter and verse to Section 1983? Is form to prevail over substance, so that this action will lie under Section 1983 in accordance with *Will's* n. 10 exception? Or does the real-world major financial impact of the relief demanded by plaintiffs mean that *Will's* general rule barring Section 1983 actions is to control here?

Recognizing the question as a difficult one, this Court has sought additional input from the parties in *Artist M.*[16] To the extent plaintiffs' suit here likewise requests relief that would have a major impact on the state's fisc, such a path again seems prudent. Because the litigants here have not had the opportunity to address the issue (their briefing was completed before *Will* came down), they are requested to file in this Court's chambers on or before August 18, 1989 additional memoranda discussing this aspect of the case.[17]

### Conclusion

No private right of action to sue Secretary exists under the Act. That deprives this Court of subject matter jurisdiction, and Secretary is dismissed as a defendant. This Court expressly determines that there is no just reason for delay, and it expressly directs entry of a final judgment of dismissal as to Secretary (see Rule 54(b) and *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)).

Plaintiffs' claim against Suter raises a threshold question under the recent decision in *Will.* Input is required from both sides as to whether Section 1983 (assuming arguendo that (1) plaintiffs have an enforceable right under the statute and (2) Suter were held to have violated the Act) has now been rendered unavailable to plaintiffs. Both sides are directed to file contemporaneous supplemental submissions on that issue in this Court's chambers on or before August 18, 1989.

### APPENDIX

As the text at n. 8 reflects, the nonexistence of any private right of action against Secretary obviates any need to consider whether plaintiffs would have standing to advance their claim if any such right could be implied. That question could pose material difficulties, presenting issues of associational standing, satisfaction of the "injury" requirement established by such cases as *Valley Forge Christian College v. Americans for Separation of Church & State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and prudential consider-

---

**16.** Just as this opinion was being placed in final form, a group of interested civil rights organizations have sought—and this Court has today granted—leave to file an amicus memorandum in *Artist M.* (in favor of a full-bore reading of *Will's* footnote 10, of course).

**17.** It is implicit in the text discussion that Suter's counsel are flat-out wrong in their simplistic assertion (Mem. 2–5 and R. Mem. 2–6) that prospective relief is barred by the Eleventh Amendment. *Ex parte Young, Edelman* and *Quern* (among many other cases) give the direct lie to that notion by expressly allowing prospective injunctive relief despite the Court's overarching reading of the Eleventh Amendment in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). And Suter's attempted reliance on *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*) is equally misguided. Apart from the very different subject matter of *Pennhurst II* (which held a federal court could not enjoin a violation of *state* law), that case confirms directly (as did *Edelman* ) that the *Ex parte Young* principle is not confined to *unconstitutional* actions by State officials. Instead the doctrine applies as well to such officials' violations of federal *law* (*Pennhurst II,* 465 U.S. at 102–03, 104 S.Ct. at 909–10).

ations. Neither party has cited any cases directly addressing the issue as against Secretary. This Court's own research has uncovered a recent Tenth Circuit opinion upholding hospitals' standing to sue a State (*Amisub (PSL), Inc. v. State of Colorado Department of Social Services*, 879 F.2d 789, 793, (10th Cir.1989), a result consistent with cases the parties have cited (see, e.g., *Virginia Hospital Ass'n*, 868 F.2d at 662–63).

One issue in this area does merit comment, because it also bears on questions still remaining in the case. Plaintiffs continually assert they are *not* seeking higher payment rates (P. Sullivan Mem. 11):

> [T]hey seek a payment system that is lawful. Thus, any increase in payments is purely incidental to the ultimate relief sought. The relief sought by plaintiffs— declaring defendant Sullivan's rubber-stamp approach to be in contravention of Title XIX—will surely redress plaintiffs' injury in that it will force defendant Sullivan to reject Illinois' assurances thereby forcing Illinois to comply with the provisions of the Medicaid Act, as it is required to do.

In a literal sense, issuance of a declaratory judgment would not "force" Secretary to comply with the Act—that would call for injunctive relief. But that matter aside, plaintiffs' assertion that they do not seek higher payment rates carries no persuasive force—that of course is the real purpose of this suit. Indeed, if all plaintiffs are really seeking is a "lawful Medicaid payment system" as such, Secretary R. Mem. 4 n. 2 is quite right in saying:

> Plaintiffs' standing to maintain such an action is no different from that of any other concerned citizens or taxpayers. Such a generalized effort on the part of citizens to enforce the law is precisely what is intended to be precluded by the legal requirement of standing to sue.