## ILLINOIS HEALTH CARE ASSOCIATION, et al, Plaintiffs,

v.

## Philip BRADLEY, in his official capacity as Director of the Illinois Department of Public Aid, Defendant.

### No. 89 C 0849.

United States District Court, N.D. Illinois, E.D.

Oct. 28, 1991.

---

James Casey, Chicago, Ill., for plaintiffs.

James C. O'Connell, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In this official-capacity lawsuit, Illinois Health Care Association ("IHCA") and Heartland Manor Nursing Center, Inc. ("Heartland") sue Director Philip Bradley ("Bradley") of the Illinois Department of Public Aid ("IDPA")[1] under 42 U.S.C. § 1983,[2] charging violations of the Medicaid Act ("Act"), Sections 1396–1396u.[3] Plaintiffs now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, plaintiffs' motion is granted and this action is dismissed in its entirety.

*Factual and Statutory Background*[4]

*Federal Medicaid Program*

■ Medicaid is a joint federal-state program under which the United States provides funds to reimburse states in part for programs of public assistance to persons "whose income and resources are insufficient to meet the costs of necessary medi-

---

**1.** Originally plaintiffs sued not only Bradley's predecessor as Director, Susan Suter, but also then United States Secretary of Health and Human Services ("Secretary") Louis Sullivan. This Court dismissed Secretary as a defendant in *"IHCA I,"* 719 F.Supp. 1419 (N.D.Ill.1989).

**2.** All further references to Title 42's provisions will simply take the form "Section—."

**3.** This Court also had to deal earlier in *"IHCA II,"* 726 F.Supp. 191 (N.D.Ill.1989) with the question whether the Act creates rights that are enforceable under Section 1983. That issue has since been definitively resolved in *Wilder v. Virginia Hosp. Ass'n,* — U.S. —, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), which held that the Act does create substantive rights in health care providers that are actionable under Section 1983.

**4.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant, in this case Bradley (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citation omitted)). This District Court's General Rule ("GR") 12(m) and 12(n) require factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements (respectively cited "P. 12(m) ¶—" and "D. 12(n) ¶—").

cal services" (Section 1396).[5] Although participation in the program is voluntary, states that choose to participate must comply with the Act and its implementing regulations (*Wilder*, 110 S.Ct. at 2513; *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980); *Wisconsin Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 864 (7th Cir.1987)). To qualify for federal reimbursement, a state must submit for the approval of the Secretary of the United States Department of Health and Human Services ("HHS") a plan for medical assistance (Section 1396a(a) and (b)). Each such plan must contain a comprehensive statement describing the nature and scope of the state's Medicaid program (42 C.F.R. ["Reg."] § 430.10 (1990)).

When originally adopted in 1965, the Act required states to reimburse nursing homes for the "reasonable cost" of services provided under a state's Medicaid plan (*Wilder*, 110 S.Ct. at 2515, citing Pub.L. 89–97, § 1902(a)(13)(B)). In 1980 Congress decided that the "reasonable cost" reimbursement was "inherently inflationary and contain[ed] no incentives for efficient performance" (S.Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 744 (hereafter cited simply "S.Rep. No. 139 at ___"); see also 2 H.R.Rep. No. 158, 97th Cong., 1st Sess. 293 (1981) (hereafter cited simply "2 H.R.Rep. No. 158 at ___")). It therefore replaced that approach with the Boren Amendment,[6] which in its current form requires a state plan for medical assistance to provide (Section 1396a(a)(13)(A)):

> for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State [here the statute sets out factors to be taken into account in developing those methods and standards]) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality.... [7]

Congress enacted the Boren Amendment with two specific purposes in mind: (1) to provide states with greater flexibility in developing reimbursement plans and (2) to reduce Medicaid costs by allowing states to develop plans that would encourage greater efficiency (*Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1309–10 (2d Cir. 1991); *Wilder*, 110 S.Ct. at 2515–16, citing 2 H.R.Rep. No. 158 at 292–93, S.Rep. No. 471, 96th Cong., 1st Sess. 28–29 (1979), and S.Rep. No. 139 at 478). Congress was clear, however, that "[t]he flexibility given states [was] not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care" (S.Rep. No. 139 at 478). Thus Congress stressed adequacy of payments so long as the providers of services were efficient

---

5. This Court discussed the Act extensively in *IHCA I*, 719 F.Supp. at 1420–22. It has also previously treated other issues related to the Act (see *Illinois Hosp. Ass'n v. IDPA*, 576 F.Supp. 360 (N.D.Ill.1983) and *Children's Memorial Hosp. v. IDPA*, 562 F.Supp. 165 (N.D.Ill.1983)).

6. That enactment was part of the Omnibus Reconciliation Act ("OBRA") of 1980, Pub.L. 96–499.

7. [Footnote by this Court] All that the Boren Amendment itself did was to change the reimbursement standard for nursing and intermediate care facilities. Congress then extended the Boren Amendment's standard to reimbursement of hospitals as part of OBRA of 1981, Pub.L. 97–35, § 2173 (see S.Rep. No. 139, which makes clear Congress' intent to adopt a standard identical to that articulated the previous year). Thus the legislative history from both amendments bears on the present analysis. Since then the standard has also been applied to reimbursement of intermediate care facilities for the mentally retarded (Pub.L. 100–203, § 4211(h)(2)(A)).

(*IHCA I*, 719 F.Supp. at 1421).[8]

*Parties*

IHCA is an Illinois not-for-profit corporation whose membership comprises 270 not-for-profit and proprietary Illinois nursing homes, most of whom participate in the Illinois Medicaid program. Heartland is an Illinois not-for-profit corporation and a member of IHCA. Heartland has participated as a provider of nursing home services in the Medicaid program since 1964 (P.Compl. and D.Ans. ¶¶ 4, 5). Bradley, as Director of IDPA, is responsible for the development of the Illinois Medicaid State Plan (D.Mem. 2).

*Illinois Reimbursement Plan for Nursing Homes*

Illinois' Medicaid reimbursement plan for nursing homes employs a "prospective, cost-based, case-mix methodology" (D.Mem. 2). In other words, the rates for a given period are based on projections of what the rate is expected to be during that period. Those projections are based on past cost reports, updated to the current rate year, which include some measure of each facility's particular case mix (D.Ex. 10 at 2).[9] Three components—capital rate, support rate, and nursing rate—are calculated separately for each facility and are then combined into a per diem rate, which is paid to that facility for each day of nursing home care it provides to Medicaid beneficiaries (Ill.Rev.Stat. ch. 23, ¶¶ 5–5.4, 5–5.5; see also P. 12(m) and D. 12(n) ¶¶ 25, 26 and D.Ex. 10).[10]

First, the capital component covers ownership and rental costs for buildings and equipment (89 Ill.Admin.Code ["Code"] §§ 140.571–.574). That element accounts

for a relatively minor portion of the overall reimbursement rate (P.Ex. 6).

Second, the support rate covers costs such as food, housekeeping, maintenance, utilities, insurance and office expenses. For purposes of determining the support rate, IDPA divides nursing facilities into seven Health Service Area ("HSA") groups. Based on the array of per diem allowable support costs of the facilities within each HSA group, IDPA identifies the 75th percentile for each group. If a facility's per diem allowable support costs are below the 75th percentile for its HSA group, the facility receives its costs plus a certain proportion of the difference between its costs and the 75th percentile as an incentive profit. All facilities whose per diem allowable support costs exceed the 75th percentile for their group receive only the 75th percentile rate (Code § 140.561(a)).

Finally, the nursing rate (which covers direct care costs, including staff salaries, consultant and therapy fees and nursing supply costs) makes the greatest contribution to the overall reimbursement rate [11] and is the main focus of plaintiffs' action (see P.Mem. 36–57). That rate is calculated based on a complex formula. One of the factors in the formula is "variable time," which purportedly accounts for the varying service needs of the particular residents in each facility (Code § 147.150(b)).

Variable time is calculated for each facility based on individual patient assessments conducted by IDPA nurse surveyors during what are known as "Inspections of Care" ("IOC") (Code § 147.150(c)). Nurse surveyors assign to each patient a level of care (e.g., 1, 2 or 3) for each of a list of various functional needs (e.g., eating or bathing)

8. *IHCA I*, 719 F.Supp. at 1420–21 discusses the legislative background of the Boren Amendment in depth.

9. Before 1981 states typically reimbursed providers retrospectively for the reasonable costs of services actually provided, but since the enactment of the Boren Amendment most states have adopted prospective reimbursement plans (*Wilder*, 110 S.Ct. at 2516 n. 7).

10. Illinois' reimbursement system also includes a fourth component, the Quality Incentive Program (QUIP). Participation in QUIP is optional

and involves bonus payments for facilities "which attain additional quality of care standards" (see D.Ex. 10 at 4, and Complaint ¶ 16). That added factor is not challenged in the current litigation and is not generally considered an integral component of reimbursement rates (P.Ex. 4, Hunter Dep. 7–8).

11. P.Ex. 26, Merritt Dep. 24. The nursing rate accounts for approximately 45–47% of the total average Medicaid reimbursement rate (P.Ex. 4, Hunter Dep. 8; and D.Ex. 2, Hunter Aff. ¶ 2).

and service needs (e.g., injections or tracheostomy care) (see Code § 147.25 and P.Exs. 8, 9). Each level of care for each functional or service need correlates to a particular number of minutes and particular staff level (licensed or unlicensed) required to provide for that need (Code § 147 Table A). Then the total number of minutes assigned to all Medicaid patients in a facility is multiplied by the average regional wage per minute and divided by the number of Medicaid patients to yield an average per diem per patient cost. That number is then multiplied by a factor to account for the costs of the director of nursing ("DON"), consultants and supplies, and thus to yield the final nursing rate (P.Ex. 4, Hunter Dep. 9; P.Ex. 11, Christie Dep. 52–60; and D.Ex. 10, Part I). Hence for each facility the nursing rate is calculated in these terms:

$$\frac{\text{(Total minutes) (regional wage/minute)}}{\text{(Number of Medicaid patients)}} \times \begin{array}{l}\text{Factor reflecting}\\\text{DON, supplies,}\\\text{consultants}\end{array}$$

### Plaintiffs' Position

Plaintiffs contend mainly that the Illinois reimbursement plan violates the requirements of the Boren Amendment.[12] In particular, plaintiffs assert that IDPA has (Motion for Summary Judgment 1–2):

1. failed to make findings and assurances that its reimbursement rates are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facili-

ties," as required by Section 1396a(a)(13)(A) and its implementing Reg. § 447.253(b);

2. relied "solely" on budgetary considerations in determining its Medicaid nursing home reimbursement rates; and

3. implemented an "arbitrary and capricious" reimbursement scheme that results in inadequate payments and therefore violates the Boren Amendment's standard.

In short, plaintiffs contend that IDPA is violating (1) the procedural Boren requirements by failing to make "findings" and "assurances" as to the adequacy of its rates and (2) the substantive Boren requirements by relying on budgetary considerations and setting inadequate rates (P.Mem. 20–21).[13] This opinion will address those contentions in turn, after turning first to the appropriate standard of review.

### Standard of Review

■ Judicial review of the Illinois plan is limited for several reasons. First, as already noted, one of the Boren Amendment's purposes was to afford states greater flexibility in developing reimbursement plans. Thus the Act does not describe and Secretary does not review the methods by which states determine their reimbursement rates (*Wilder*, 110 S.Ct. at 2516). Rather the statute refers to rates "determined in accordance with methods and standards developed by the State ..." (Sec-

---

**12.** Plaintiffs' Complaint also alleges that the Illinois plan violates three additional sections of the Medicaid Act:

1. Section 1396a(a)(2), which requires financial participation by the state "which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan";

2. Section 1396a(a)(30)(A), which requires "methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care"; and

3. Section 1396a(a)(37)(B), which requires "procedures of prepayment and postpayment claims review ... to ensure the proper and efficient payment of claims and management of the program."

Plaintiffs have apparently decided not to pursue those claims, however, and refer only to Section 1396a(a)(13)(A) in their motion for summary judgment. In any event, compliance with those additional sections—with the possible exception of Section 1396a(a)(37)(B)—is most likely ancillary to compliance with Section 1396a(a)(13)(A) and its implementing regulations.

**13.** Plaintiffs seek only a declaratory judgment that IDPA has violated the Act. They do not include a prayer for either money damages or injunctive relief.

tion 1396a(a)(13)(A)). Notwithstanding that goal of flexibility, the Act and its implementing regulations do impose some stated requirements. States must make annual findings, and must provide assurances to Secretary whenever they substantially modify their plans, that their rates are reasonable and adequate to cover the costs incurred by economically and efficiently operated facilities that provide care in compliance with state and federal standards. This Court's review is thus limited to whether IDPA has complied with those requirements. Despite plaintiffs' urging (P.Mem. 2, 36–57), this opinion will not review the methodology by which IDPA establishes its reimbursement rates, as it was clearly Congress' intent that methodological decisions be left to state agencies.

■ In evaluating IDPA's compliance with federal statutory and regulatory mandates, this Court must also remain mindful that the Illinois plan for reimbursement of nursing homes has been approved by Secretary (*IHCA I*, 719 F.Supp. at 1422; see also D.Ex. 21). That being so, the Illinois plan is a product of both state and federal agency action. Thus despite the fact that Secretary has been dismissed as a defendant in this action,[14] this Court must review the Illinois plan with the deference that is accorded federal agency actions (*Pinnacle*, 928 F.2d at 1313).

Federal court review of federal agency action is limited (*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971)). As set forth in the Administrative Procedure Act (5 U.S.C. § 706), a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." Thus "the Secretary's decision is entitled to a

presumption of regularity" (*Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823) and a court is "not empowered to substitute [its] judgment for that of the agency" (*id.* at 410, 91 S.Ct. at 820). Despite that narrow scope of review, however, this Court is required within its boundaries to conduct a "thorough, probing in-depth review" (*id.* at 415, 91 S.Ct. at 823; see also *Loyola University of Chicago v. Bowen*, 905 F.2d 1061, 1067 (7th Cir.1990)). It is not "limited to rubber stamping agency action," and the scope of review includes a determination whether the Illinois plan complies with the requirements of federal law (*Pinnacle*, 928 F.2d at 1314).[15]

### *Procedural Requirements of Section 1396a(a)(13)(A)*

To carve the critical phrase out of the long earlier quotation, Section 1396a(a)(13)(A) requires each state to set reimbursement rates "which the State finds and makes assurances satisfactory to the Secretary are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." Implementing regulations require that whenever a state agency makes a change in its "payment methods and standards," it must submit "assurances" to the Health Care Financing Administration ("HCFA")[16] that, among other requirements, it pays for services at "rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers" (Reg. § 447.253(a) and (b)(1)). In addition, the regulations require that "[w]henever the Medicaid agency makes a change in its methods and standards, but *not less often than annually*," the agency must make "findings" that its rates comport with the standard (Reg. § 447.253(b))

---

14. *IHCA I*, 719 F.Supp. at 1422–25.

15. Thus federal courts have ruled on whether state Medicaid reimbursement plans comply with federal law even though those plans have already been approved by HHS. See, e.g., *Pinnacle*, 928 F.2d at 1311, 1314 and *Nebraska*

*Health Care Ass'n v. Dunning*, 778 F.2d 1291, 1293 (8th Cir.1985).

16. HCFA is the agency within HHS that administers the Medicaid program (see Reg. §§ 447.-250–.257).

(emphasis added). Those later findings need not be submitted to HCFA.

■ Despite the fact that Secretary reviews only a state's assurances and not the findings that underlie them, *Wilder*, 110 S.Ct. at 2519–20 and n. 11 makes clear that the two are "separate obligations" and are not "procedural requirements only." As *Wilder, id.* at 2519 n. 11 (emphasis in original) explains:

> The requirement that a state make such a finding is a necessary prerequisite to the subsequent requirement that the State provide "assurances" to the Secretary. That the requirements are separate obligations is apparent from the Secretary's regulations.... Moreover, the Secretary's interpretation of his role under the statute—that he will review the reasonableness of the assurances presented by a State rather than the findings themselves—is based entirely on his understanding that a State has the responsibility to *find* that its rates are adequate before making assurances to the Secretary.

And going on, *Wilder, id.* at 2519–20 states:

> We reject that argument [that the requirements of findings and assurances are procedural requirements only] because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless.

As part of the findings requirement, *Wilder, id.* at 2523 (emphasis added) holds that a state must "judge the reasonableness of its rates *against the objective benchmark* of an 'efficiently and economically operated facility.' "

Several Courts of Appeals have had occasion to discuss the findings requirement in light of *Wilder. Pinnacle*, 928 F.2d at 1314 quotes *AMISUB (PSL), Inc. v. Colorado Dep't of Social Services*, 879 F.2d 789, 796 (10th Cir.1989) (emphasis in original) as setting out an appropriate framework for evaluating the adequacy of a state's findings:

> [t]he plain language of federal Medicaid law mandates the state Medicaid Agency, *at a minimum*, to make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.

*Pinnacle, id.* then summarized that framework:

> In other words, the state must make findings which establish a nexus between the costs of operating efficient and economic nursing facilities and the proposed reimbursement rates under the state plan.

*Pinnacle, id.* at 1313–16 invalidated a New York plan upon determining that the state agency had not made such findings and had therefore submitted assurances that "constituted nothing more than a formalistic recitation of the federally mandated requirements" (*id.* at 1312, quoting the District Court below).[17] *Temple University v. White*, 941 F.2d 201 (3d Cir.1991)— also quoting the framework articulated by *AMISUB* (*id.* at 209 n. 10)—similarly invalidated a state plan based on evidence that the state (1) had not conducted any studies as to actual hospital costs and (2) therefore did not know the costs of operating an efficient and economical hospital or wheth-

---

**17.** Relying on *Wilder, Pinnacle, id.* at 1313–14 (citations omitted) stated:

> We decline the state's invitation to read the procedural requirements of the Boren Amendment as mere surplusage. The Supreme Court recently dispelled this notion, reconfirming that the procedural requirements of the Boren Amendment were intended to be observed.... In light of the abundant evidence demonstrating that Congress intended

that the procedural requirements be followed, the state's argument that "findings" are not mandatory is fatally flawed. That conclusion is reinforced by the mandatory, rather than precatory, language of the statute itself. Although procedural requirements may reduce some of the state's "flexibility" in determining their own schemes of reimbursement, this is what the plain language of the statute requires.

er its rates were reasonable or adequate relative to those costs (*id.* at 210–11).[18]

■ Like the state agencies in *Pinnacle* and *Temple University,* IDPA has wholly failed to make the findings required by the Boren Amendment and its implementing regulations. Like those agencies, IDPA has not taken the first step in an adequate findings process—identifying the "objective benchmark" of an efficiently and economically operated facility. Bradley (in the official-capacity sense) admitted as much during the discovery process. Plaintiffs posed the following interrogatory (P.Ex. 25 Int. 3) to his predecessor in office Kathleen Kustra:

> State the criteria used by IDPA to identify nursing homes that are "efficiently and economically" operated for purposes of making ... findings.

She responded:

> The Illinois Department of Public Aid does not identify specific nursing homes that are "efficiently and economically" operated.

She then went on to describe IDPA's purported compliance with the findings and assurances requirement:

> The three components of rates underlying these findings and assurances are support, nursing, and capital. Regarding support, the Department ranks the per diem support rate costs of nursing facilities based on the facilities' costs as reported in their cost reports, plus an inflation factor. The facilities having per diem costs at or below the per diem support cost value at the 75th percentile are paid, for this component, at a level equal to or in excess of their actual costs. Regarding nursing, those facilities that have nursing wage costs at or below the

regional average wages of nursing personnel as reported in their cost reports, plus an inflation factor, and that provide nursing care and services with staff times at or below the standard average staff times as established by nursing practice, are paid, for this component, at a level equal to or in excess of their actual costs. Regarding capital, facilities that realize the maximum rate of return from ownership or rental cost are those facilities which have facility investment costs which are equal to or below the established regional ceilings.

IDPA seems to be implying there that the various averages, percentiles, and ceilings upon which it bases reimbursement rates reflect the costs that would be incurred by economical and efficient facilities. Such an approach is not unreasonable in itself, for averages and percentiles are commonly used by states in determining reimbursement rates (*AMISUB,* 879 F.2d at 798).[19] But Bradley presents no evidence at all that IDPA has found any nexus between its chosen percentiles and the costs of operating an efficient and economical facility. While the various percentiles and ceilings *may* represent the costs incurred by efficient and economical facilities, IDPA has made no finding that this is so. Indeed, as *Wilder, Pinnacle* and *Temple University* have all taught, such a finding is not possible when the state has failed to identify any objective efficiency standard against which to compare its rates. Without identifying such a standard, IDPA has no way of knowing whether the particular percentiles chosen bear any relationship to economy and efficiency.

Moreover, percentiles are only as valuable as the figures upon which they are

**18.** In support of its argument that the findings requirement is actually much less stringent than as outlined in *Pinnacle* and *Temple University,* IDPA points to *Colorado Health Care Ass'n v. Colorado Dep't of Social Services,* 842 F.2d 1158 (10th Cir.1988); *Mississippi Hosp. Ass'n, Inc. v. Heckler,* 701 F.2d 511 (5th Cir.1983); *Folden v. Washington State Dep't of Social & Health Services,* 744 F.Supp. 1507 (W.D.Wash.1990); *Michigan Hosp. Ass'n v. Babcock,* 736 F.Supp. 759 (W.D.Mich.1990); and *Mary Washington Hosp., Inc. v. Fisher,* 635 F.Supp. 891 (E.D.Va.1985). But all those cases preceded *Wilder,* and to the

extent that their holdings disagree with *Wilder's* mandates they are of course no longer relevant.

**19.** This Court itself has held that "a percentile formula *may* be a reasonable way to identify inefficient providers" (*Children's Memorial Hosp.,* 562 F.Supp. at 172 (emphasis in original)). *Mississippi Hosp. Ass'n,* 701 F.2d at 517–18 similarly upheld a percentile-based ceiling, but only after concluding that it was based on "careful and objective studies."

based. If the cost figures do not reflect actual costs incurred, then percentages or averages based on those figures provide no reliable information about economical and efficient operation. Again IDPA has made no findings as to the accuracy of the methods by which it calculates costs.

That delinquency is most glaring in the case of the nursing rate, which accounts for nearly half of the total reimbursement rate. As described earlier, variable time—a central component of the nursing rate—is determined by nurse surveyors, who assess the time required to provide for the service needs of each facility's particular patient population. Those surveyors determine each patient's required level of care in various needs categories, and each level of care correlates to a particular number of minutes and a corresponding staff level theoretically required to provide for that need. Thus the total number of minutes of care assigned to each facility becomes an important factor in determining its overall nursing rate.

Yet IDPA has made no findings at all as to the accuracy of the assessment tool that it uses to determine variable time or the overall nursing rate that it produces. For example, IDPA has not made findings that the number of minutes assigned to each level of care for each need category (see Code § 147 Table A) reflects the amount of time actually required to provide for that need efficiently.[20] Similarly, IDPA has made no finding that the list of needs assessed encompasses the complete range of tasks for which nursing time might be required. Thus IDPA does not even know whether the method by which it calculates costs reflects actual costs, and by definition it cannot know whether averages or percentiles based on those costs are related in any way to the costs of running an economical and efficient facility.

Some time after plaintiffs' interrogatories were served and answered, IDPA conducted two studies of the profitability of nursing homes in Illinois. Its first (D.Ex. 23) compares the actual costs incurred by 30 facilities that earned high profits during 1989 with the Medicaid reimbursement rates that they received. Of those, 28 were reimbursed at rates that exceeded their costs for the three rate components. Although the profitability of those homes may indeed indicate that they are efficiently and economically run, IDPA has again failed to make any finding that this is so. For example, it has provided no evidence that those facilities "provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards," an equally important aspect of the Boren standard (Section 1396a(a)(13)(A)).[21] Even more importantly

20. IDPA representatives contend that the times were developed by an "expert" panel during 1981 and 1982 and were based on a number of time and motion studies conducted in other states (P.Ex. 11, Christie Dep. 36–37; P.Ex. 12, Peddicord Dep. 37–41; see also D.Exs. 6 (which seems to indicate that the panel may also have met in 1983), 7, and 8). That contention is at least suspect in evidentiary terms, because Bradley admits that IDPA has not been able to locate or produce any such studies (D. 12(n) ¶ 45; see also P.Ex. 4, Hunter Dep. 15; P.Ex. 11, Christie Dep. 38). But even if the times were based on expert opinions and studies in 1981–82, that would still not satisfy the findings requirement. First, IDPA has over the years changed both the assigned times and the levels of care in various categories, and has added new categories, without conducting or consulting any additional studies (D.Ex. 9; P.Ex. 11, Christie Dep. 38–50; P.Ex. 13 ¶ 6). In addition, Reg. § 447.253(b) requires annual findings (see *AMISUB*, 879 F.2d at 799, which, stressing the annual findings requirement, (1) rejects "the historical trends con-

cept, i.e., since the old system was adequate, and the same amount of dollars are paid out under the new system, the new system must be adequate" and (2) holds that the state may not rely on HHS's acceptance of its plan ten years earlier). Ten-year-old findings cannot come close to satisfying the annual findings requirement, especially given the rapidly changing nature of health care technology.

21. IDPA's internal memo that accompanied the study asserts that "sixty percent of these facilities received 5 or 6 QUIP stars whereas only thirty-one percent of all LTC [long term care] facilities qualified for 5 or 6 stars," and that most of these facilities were "subject to inspections from several organizations." That information may be relevant to the question of whether the facilities satisfy the quality requirements of Section 1396a(a)(13)(A), as QUIP points are related to quality of care. However, Bradley has not provided any evidence that the QUIP components are related to "applicable State and Federal laws, regulations, and quality and safely standards."

in substantive terms—and critically so for IHCA members with lesser profits or even losses—nothing in such a "survey" casts light on whether or not such other nursing homes are *also* "economically and efficiently operated," so that higher rates are called for to keep *them* afloat to serve the public needs.[22]

IDPA's second study (D.Ex. 24), which lists the profits earned by 176 Illinois facilities, is even less useful. Profitability alone provides no information about the adequacy of Medicaid reimbursements, as those facilities serve private patients as well as Medicaid beneficiaries. Thus IDPA's "reasoning" in these terms (*id.* at Clarification Note 5) is wholly flawed:

> The 176 facilities on this list earned a total of $111.4 M in profits last year. The facilities on this list represent 36% of all Medicaid patient days. This indicates that our rates are "adequate" to more than cover the costs of efficiently operated nursing homes.[23]

Moreover, neither study sheds any light on IDPA's compliance with the procedural requirement of the Boren Amendment— each has plainly been conducted in response to this litigation and not as a basis for IDPA's assurances to HHS. Even if either or both studies did prove (as they have not) that Illinois was reimbursing at rates that are reasonable and adequate to meet the costs incurred by efficiently and economically operated facilities, any such compliance with the substantive requirements of the Boren Amendment would

have occurred purely by chance and not as a result of IDPA's compliance with the procedural Boren requirements.

Finally, in perhaps its most awkward attempt to prove the existence of findings, IDPA offers evidence that the number of nursing home beds in the state of Illinois has increased while occupancy has decreased,[24] that people are willing to buy nursing homes in Illinois and that the sale of nursing homes yields capital gains. Exhibiting its clear misunderstanding of the findings requirement, IDPA argues that those facts are "effectively a finding that the reimbursement rate in fact is not too low" (D.Mem. 12). As with profitability alone, those facts bear at best an uncertain relationship to the reasonableness or adequacy of Medicaid reimbursement rates— they certainly do not constitute the type of meaningful findings envisioned by *Wilder*.

Bradley has presented no other evidence of findings as to the adequacy of the Illinois Medicaid reimbursement rates. Without question IDPA has failed to make findings that its rates are reasonable and adequate to meet the costs that must be incurred by economical and efficient nursing homes. IDPA does not know the costs of economically operating a nursing home or whether its rates are adequate to cover such costs. Even construing the facts in the light most favorable to IDPA, this Court must conclude that it has failed to make findings as required by Section 1396a(a)(13)(A).

---

**22.** To frame the point somewhat differently, a showing that the *most* economically and efficiently operated firm in an industry can make a go of it at a stated price tells nothing about whether the No. 2 firm does or does not meet the objectively stated statutory standard. What the Boren Amendment enacts is a kind of variant on Gresham's Law—driving out only those facilities that fall below the statutorily prescribed standard—and not a free-market competitive model. It is Professor Ronald Coase and *not* Congress who has just received the richly-deserved (and really long-overdue) Nobel Prize in economics. To be sure, a state *could* (based on appropriate findings) define "economically and efficiently operated" in a way that accomplishes the free-market result—but Illinois has not purported to do that or anything else in the way of the mandated findings.

**23.** [Footnote by this Court] In addition, as in the other study, aside from asserting that "these same facilities provide better than average quality" (D.Ex. 24 forwarding memorandum) IDPA provides no evidence that the facilities in the second study comply with the quality requirements of Section 1396a(a)(13)(A).

**24.** Bradley's retained expert relates unused bed capacity to "the relative inefficiency of the Illinois long-term care industry" (D.Ex. 18, Menenberg Dep. 12). Industry-wide efficiency or inefficiency, however, has no bearing on whether Illinois rates are adequate to reimburse those facilities that *are* efficiently operated.

Because IDPA has not made findings supporting the reasonableness and adequacy of its rates, it has been submitting baseless assurances to HCFA. Indeed IDPA's assurances appear to do no more than briefly summarize plan changes and repeat the language of the applicable federal regulations (see P.Exs. 22, 27). Assurances that "do little more than duplicate the language of the applicable regulation" do not satisfy statutory requirements (*Pinnacle*, 928 F.2d at 1315). They do nothing to "assure" Secretary that IDPA's representations as to the reasonableness and adequacy of its rates are actually correct. Whatever assurances IDPA has submitted therefore do not comply with the requirements of Section 1396a(a)(13)(A) and are procedurally invalid.

Because IDPA has failed to make adequate findings and assurances, the Illinois Medicaid reimbursement plan violates the procedural requirements of the Boren Amendment and its implementing regulations. These violations of the procedural requirements of Section 1396a(a)(13)(A) suffice to invalidate the state's Medicaid reimbursement plan. As *Wilder*, 110 S.Ct. at 2523 n. 18 makes clear:

> If a State errs in finding that its rates are reasonable and adequate, or in supplying assurances to that effect to the Secretary, then a provider is entitled to have the court invalidate the current state plan and order the State to promulgate a new plan that complies with the Act.

*Nebraska Health Care Ass'n*, 778 F.2d at 1294 also held that "[t]he failure of the state to satisfy the requirements of federal regulations when the plan was submitted is a sufficient basis for ... enjoining the state from giving effect to" its plan (see also *Temple University*, 941 F.2d at 211, which similarly invalidated a state plan based on procedural noncompliance alone).

### Substantive Requirements of Section 1396a(a)(13)(A)

Although procedural noncompliance is sufficient to invalidate the Illinois plan and therefore to grant plaintiffs' motion, this opinion will briefly address plaintiffs' claims as to substantive noncompliance. Such a discussion is useful, both because the issue has been briefed (and the briefing demonstrates the parties' confusion on the subject) and because IDPA must go back to the drawing board in any case.

■ As a necessary corollary to the requirement that states make findings regarding the reasonableness of their reimbursement rates, *Wilder*, 110 S.Ct. at 2520 (emphasis in original) makes clear that Congress intended states to adopt rates that actually are reasonable and adequate:

> It would make little sense for Congress to require a State to make findings without requiring those findings to be correct.... Rather, the only plausible interpretation of the Amendment is that by requiring a State to *find* that its rates are reasonable and adequate, the statute imposes the concomitant obligation to adopt reasonable and adequate rates.

But while emphasizing that requirement, *Wilder* remains cognizant of Congress' intent to maintain flexibility and to leave methodological choices on rate setting in the hands of the states (*id.* at 2520–21). Although such intended flexibility does not render state plans unreviewable, *Wilder* points out that it may affect the standard under which courts review substantive compliance with the Boren Amendment (*id.* at 2523).

Courts of Appeals, including our own, have accordingly agreed that a deferential standard of review ought to be employed in evaluating compliance with the substantive Boren requirements (*id.* at 2523 n. 18, citing *AMISUB*, 879 F.2d at 795–801; *West Virginia University Hosps., Inc. v. Casey*, 885 F.2d 11, 23–24 (3d Cir.1989), aff'd in part, — U.S. —, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (dealing only with the issue of attorneys' fees); *Nebraska Health Care Ass'n*, 778 F.2d at 1294; *Wisconsin Hosp. Ass'n v. Reivitz*, 733 F.2d 1226 (7th Cir.1984); and *Mississippi Hosp. Ass'n*, 701 F.2d at 516). Federal courts are not at liberty to substitute their judgments for that of the agency or to evaluate IDPA's methodology for rate determination. Judi-

cial review is limited to whether or not IDPA's overall rate comports with the Boren "reasonable and adequate" requirement.

In addition, there is not one single "reasonable and adequate" rate. Rather, "rates required to meet a standard of reasonableness may fall within a *zone* of reasonableness, ... and a reviewing court is 'without authority to set aside any rate ... which is within a "zone of reasonableness"'" (*Wisconsin Hosp. Ass'n*, 733 F.2d at 1233 (emphasis in original, citation omitted); *Wilder*, 110 S.Ct. at 2523).

As support for their argument that IDPA's plan does not comply with the substantive Boren requirements, plaintiffs argue that Illinois reimbursement rates are "wholly budget driven" (P.Mem. 31). But while it is true that Congress intended that state plans not be developed "solely on the basis of budgetary appropriations" (H.R.Conf.Rep. No. 1479, 96th Cong., 2d Sess. 154), courts have not invalidated plans simply because they were motivated by budgetary considerations. *Wisconsin Hosp. Ass'n*, 733 F.2d at 1235–36, noting the Boren Amendment's goals of reducing Medicaid costs and providing states with flexibility in determining their rate setting methodologies, held that a budget-driven delay in rate increases did not necessarily violate the federal standard. Instead the court held that the plan, even if budget-motivated, was not invalid unless it also did not fall within the federally mandated zone of reasonableness. *AMISUB*, 879 F.2d at 799–800 similarly said that the court there would approve the application of a "budget adjustment factor" (a purely budget-related percent decrease in rates) as long as the resulting reimbursement rates complied with federal substantive requirements (see also *Mississippi Hosp. Ass'n*, 701 F.2d at 518).

In short, while states cannot violate the Boren substantive requirements in order to serve budgetary goals (*Illinois Hosp. Ass'n*, 576 F.Supp. at 367–68), the relevant question is not whether the Illinois reimbursement plan is budget-motivated. Instead the real issue is whether, for whatever reasons or by whatever methods the rates may have been determined, Illinois' reimbursement rates are reasonable and adequate to cover the costs incurred by economic and efficient facilities.

As presented on the current motion, the record does not contain sufficient facts for this Court to determine whether or not Illinois' reimbursement rates satisfy that substantive requirement. Such a determination, like the findings process itself, would require information as to the costs of operating an economical and efficient nursing home and as to whether Illinois' rates are adequate to cover those costs. Because IDPA has not made adequate findings, it has been unable to offer relevant evidence in support of its rates. Plaintiffs have also failed to provide the information necessary to resolve this issue. When Illinois returns to its procedural task (as it must), it must also meet the substantive demands of the Boren Amendment.

*Conclusion*

There is no genuine issue of material fact as to IDPA's clear noncompliance with the procedural requirements of the Boren Amendment. Even given the narrow scope of judicial review, the Illinois Medicaid reimbursement plan for nursing homes violates federal law. This Court therefore declares that the Illinois plan is invalid. And because the sole relief sought by plaintiffs is declaratory,[25] this declaratory judgment in its favor is the final order

---

**25.** Although the Complaint's *Summary of Action* describes itself as seeking "declaratory and other relief" and although the Complaint concludes with the conventional prayer asking this Court to "[p]rovide such other, further or different relief as the Court deems reasonable, just and proper," that level of generalization does not justify this Court's now reaching out to devise any remedy beyond what is reflected here. Plaintiffs do have one specific request for further relief—that for an award of attorneys' fees. That issue, which remains for future determination, does not impair the finality of the current ruling under *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988).

in this action.[26]

**26.** *Pinnacle,* 928 F.2d at 1316–17 vacated a district court's dismissal of the nursing homes' substantive challenge under circumstances entirely parallel to those here. It concluded its discussion of the absence of definitive proof on either side such as to permit the granting of summary judgment by saying (*id.* at 1317):

> Without expressing a view on the merits of this issue, we hold that the nursing homes' substantive claim should be reinstated for further proceedings in the district court. Although the court has declared the 1987 Adjustment void on procedural grounds, that does not prevent the state from making the proper findings and resubmitting the plan to HCFA. As it now stands, the nursing homes are left with no case below should that eventuality occur. They would be relegated to commencing a new action.

With all respect, this Court finds that unpersuasive. Illinois has no valid reimbursement plan, and therefore *this* "case or controversy" is over. Though future activity by IDPA may perhaps generate (or may even be most likely to generate, given the incentives for states to participate in the voluntary Medicaid program) a valid plan, that possibility (or even likelihood) does not create a real live dispute today. If, as and when such a dispute arises, it will be time enough for a new lawsuit to be brought to deal with what would then be an Article III controversy about a validly adopted Medicare reimbursement plan.