983 F.2d 1460
 61 USLW 2468, 39 Soc.Sec.Rep.Ser. 710,
Medicare & Medicaid Guide P 41,028
 ILLINOIS HEALTH CARE ASSOCIATION and Heartland Manor Nursing
Center, Incorporated, Plaintiffs-Appellees,
v.
Philip BRADLEY, in his official capacity as Director of the
Illinois Department of Public Aid, Defendant-Appellant.
 No. 91-3824.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 23, 1992.
Decided Jan. 26, 1993.
 
 James J. Casey, Kathleen M. O'Laughlin, Larry Manson, Dorothy Ward, Keck, Mahin & Cate, and Bruce Stratton, Thomas J. Reed, and Rita M. Sayre, Chicago, IL, for plaintiffs-appellees.
 James C. O'Connell, Asst. Atty. Gen., Roland W. Burris, Office of the Atty. Gen.; and David Adler, Office of the Atty. Gen., Welfare Litigation Div., Chicago, IL, for defendant-appellant.
 Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Senior Circuit Judge.
 
 
 1
 The Illinois Department of Public Aid appeals from a declaratory judgment which invalidated its Medicaid reimbursement plan for nursing homes. We affirm.
 
 I. BACKGROUND
 
 2
 Money is rarely given without strings attached, and the Medicaid program is no exception. Under the Medicaid Act ("Act"), 42 U.S.C. § 1396 et seq., the federal government provides financial assistance to states so that the states may furnish medical services to needy individuals. Among the services which Medicaid funds is the provision of long-term care in nursing homes. To receive federal funding for this service and others, states must comply both with federal requirements imposed by the Act and with regulations promulgated by the Secretary of the United States Department of Health and Human Services ("Secretary"). See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990); Illinois Council on Long Term Care v. Bradley, 957 F.2d 305, 306 (7th Cir.1992).
 
 
 3
 One of these federal requirements is that states submit to the Secretary, and have approved, a plan for medical assistance. The state plan is required to establish a scheme for reimbursing health care providers for the medical services they provide to Medicaid patients. Under the 1981 "Boren Amendment," the Act requires a participating state to reimburse the health care providers at rates the "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 U.S.C. § 1396a(a)(13)(A).
 
 
 4
 As the Secretary's regulations recognize, the Boren Amendment envisions a two-step process. First, a state must make "findings" that its payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 C.F.R. § 447.253(b)(1). These findings must be made whenever the state Medicaid agency "makes a change in its methods and standards, but not less often than annually." Id. After making these findings, the Medicaid agency "must make assurances" to the Secretary that the state plan complies with the applicable federal laws and regulations. Id. § 447.253(a); see Wilder, 496 U.S. at 513 n. 11, 110 S.Ct. at 2519 n. 11 (requirement of a finding is a "necessary prerequisite" to requirement of an assurance).
 
 
 5
 While a state cannot give an assurance to the federal government that its Medicaid program is in compliance without first making a finding to that effect, it is possible to make a finding without then issuing an assurance. As the regulations specify, a state must make a finding at least annually. A state need not issue an assurance to the federal government, however, unless it has changed its "payment methods and standards." 42 C.F.R. § 447.253(a); see Wilder, 496 U.S. at 513 n. 11, 110 S.Ct. at 2519 n. 11 (findings and assurances are "separate obligations"). This dispute revolves around the question of whether Illinois has properly complied with the findings requirement.
 
 II. PROCEDURE
 
 6
 Almost four years ago, the Illinois Health Care Association and Heartland Manor Nursing Center ("Plaintiffs") filed a complaint in federal district court against the Secretary and against the Director of the Illinois Department of Public Aid ("IDPA"). Plaintiffs alleged that Defendants, acting in their official capacities, violated federal law by failing to comply with the Boren Amendment. The court properly exercised jurisdiction under 28 U.S.C. § 1331. Both defendants filed motions to dismiss and on August 4, 1989, the district court dismissed the Secretary on the basis of subject matter jurisdiction. On June 25, 1990, the district court denied IDPA's motion to dismiss.
 
 
 7
 On April 19, 1991, following a period of discovery, Plaintiffs filed a motion for summary judgment requesting a declaration that IDPA's actions were in contravention of the Medicaid Act. On October 28, 1991, the district court ruled in Plaintiffs' favor. Plaintiffs moved to amend the court's final order, but the court denied that motion on November 12, 1991. Defendant then filed this appeal on December 11, 1991. As the appeal from the final order was timely, we have jurisdiction under 28 U.S.C. § 1291.
 
 III. STANDARD OF REVIEW
 
 8
 We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. Williams v. Anderson, 959 F.2d 1411, 1413 (7th Cir.1992); Appley v. West, 929 F.2d 1176, 1179 (7th Cir.1991). We will uphold the entry of summary judgment "if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 
 9
 In making this determination, we employ the same standard as that employed by the trial court pursuant to Federal Rule of Civil Procedure 56(c). Lett v. Magnant, 965 F.2d 251 (7th Cir.1992). As the district court correctly noted, the Illinois reimbursement plan was approved by the Secretary and thus is a product of state and federal agency action. Illinois Health Care Ass'n v. Bradley, 776 F.Supp. 411, 417 (N.D.Ill.1991). A trial court, therefore, must review the plan with the deference accorded federal agency actions. Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1313 (2d Cir.1991). This deference entitles the reimbursement plan to a presumption of regularity, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), but does not prevent the court from "a thorough, probing, in-depth review." Id. at 415, 91 S.Ct. at 823.
 
 
 10
 In conducting this review, the court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706. Our task then is to determine whether the Illinois plan complies with the requirements of federal law. Pinnacle Nursing Home, 928 F.2d at 1313. Only if there is no genuine issue of material fact as to IDPA's noncompliance, may we affirm the district court's judgment.
 
 IV. DISCUSSION
 
 11
 A. Summary Judgment Confined to Procedural Defects
 
 
 12
 In their summary judgment motion, Plaintiffs asserted that Defendant failed to comply with the Boren Amendment's procedural and substantive components. Procedurally, Defendant allegedly failed to make findings and assurances that IDPA's reimbursement rates were reasonable and adequate to meet costs incurred by efficiently and economically operated facilities, as required by the Boren Amendment. Substantively, Defendant allegedly implemented a reimbursement scheme that resulted in inadequate payments and therefore violated the Boren Amendment's standard.
 
 
 13
 The district court limited its review, and final ruling, to the Plaintiffs' procedural claim. Prominent in the court's decision was its belief that "it was clearly Congress' intent that methodological decisions be left to state agencies." Illinois Health Care Ass'n, 776 F.Supp. at 417. This position finds support in Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), where the Supreme Court discussed at length the legislative history of the Boren Amendment. The Court concluded that Congress passed the Amendment in response to rapidly rising Medicaid costs. Congress blamed the inflationary spiral in part on the Secretary's complex and rigid reimbursement regulations. Id. at 506, 110 S.Ct. at 2515.
 
 
 14
 In order to develop alternative reimbursement methodologies that would promote efficient and economical delivery of services, Congress decided to give states more flexibility in calculating reasonable reimbursement rates. Id. States, for instance, could adopt prospective reimbursement rates. Instead of reimbursing health care providers for the actual cost of services already provided, a state could pay providers in advance based on a state's formula for what such services should cost. Id. at 507 n. 7, 110 S.Ct. at 2516 n. 7; Lett v. Magnant, 965 F.2d 251, 253 (7th Cir.1992).
 
 
 15
 Concomitantly, Congress reduced the Secretary's involvement in the rate-setting process. While the Secretary still approves a state's plan for medical assistance, the Secretary does not review the methods by which a state determines its reimbursement rates. Rather than inspecting the finding or the underlying data, the Secretary reviews only the reasonableness of the state's assurance. Wilder, 496 U.S. at 507-08, 110 S.Ct. at 2516-17.
 
 
 16
 Neither party challenges the district court's decision to confine its review to IDPA's procedural compliance. There is no need, therefore, to review whether the court erred in dismissing Plaintiffs' challenge to Defendant's compliance with the substantive requirements of the Boren Amendment. We would note, however, that Wilder does not foreclose such a challenge. See id. at 510, 110 S.Ct. at 2517; Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1317 (2d Cir.1991); Amisub (PSL), Inc. v. Colorado Dep't of Social Servs., 879 F.2d 789, 795 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); Multicare Medical Center v. Washington, 768 F.Supp. 1349, 1389 (W.D.Wash.1991).
 
 
 17
 With this understanding of the Amendment's history and purpose, we now turn our attention to its procedural requirements.
 
 B. The Findings Requirement
 
 18
 In Wilder the Supreme Court was faced with the question of whether a health care provider could bring an action under 42 U.S.C. § 1983 to challenge a state's Medicaid reimbursement methodology. In a close decision, the Court ruled that the Medicaid Act, and specifically the Boren Amendment, did provide health care providers an enforceable right "to the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients." Wilder, 496 U.S. at 509-10, 110 S.Ct. at 2517.
 
 
 19
 As the Court noted, this right "is not merely a procedural one that rates be accompanied by findings and assurances (however perfunctory) of reasonableness and adequacy; rather the Act provides a substantive right to reasonable and adequate rates as well." Id. at 510, 110 S.Ct. at 2517. The right to findings, in the Court's opinion, means the right to accurate findings: "It would make little sense for Congress to require a State to make findings without requiring those findings to be correct." Id. at 514, 110 S.Ct. at 2520.
 
 
 20
 How does a state ensure its findings comply with the Boren Amendment? The Wilder Court interpreted the statute as requiring a State, "in making its findings, to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." Id. at 519, 110 S.Ct. at 2523. In following the Court's instructions, however, we are faced with the difficulty that neither the Act, the Secretary, or the Court define the terms "efficient" or "economical" nor do they require the states to do so. Id. at 507, 110 S.Ct. at 2516.
 
 
 21
 Given this "definitional abyss," there predictably has been "considerable litigation" as to a state's obligations. Lett v. Magnant, 965 F.2d 251, 253 (7th Cir.1992). One of the more widely cited circuit decisions on the findings requirement is Amisub (PSL), Inc. v. Colorado Department of Social Services, 879 F.2d 789 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990). The Tenth Circuit interpreted the findings requirement as encompassing a three-part determination:
 
 
 22
 The plain language of federal Medicaid law mandates the State Medicaid Agency, at a minimum, to make 'findings' which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.
 
 
 23
 Id. at 796.
 
 
 24
 Amisub was written before Wilder and dealt with hospital reimbursement rates. Many federal courts, however, have found nothing in Wilder that would undermine the earlier case's validity. See, e.g., Temple Univ. v. White, 941 F.2d 201 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992) (citing Amisub test). We find no discrepancy in possibly applying the Amisub test to nursing homes, as the Boren Amendment addresses "hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded." 42 U.S.C. § 1396a(a)(13)(A). The Amisub approach satisfied the Tenth Circuit and deserves consideration, but we do not adopt it as a mandatory test. As the Tenth Circuit recognized, "a state is free to create its own method for arriving at the required findings." 879 F.2d at 797. We agree.
 
 
 25
 In particular, we reject the inference that a state must identify a reasonable sample of particular existing nursing homes as paradigms of efficiency; such a task may be impossible. Also, the results of such an effort might lead to more controversy and a waste of money better spent on patients. Perhaps an effort to determine the median cost of operating nursing homes that pass all regulatory inspections while retaining private patients at the same level of care possibly could have some value, but those matters are for the state to solve by combining its economic expertise with its practical knowledge. A state must determine in its own way what it would consider to be efficient and economic nursing facilities and "must make findings which establish a nexus between the costs of operating" those facilities and "the proposed reimbursement rates under the state plan." Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1314 (2d Cir.1991).
 
 
 26
 We now consider whether the state agency made the proper findings.
 
 C. IDPA'S Findings
 
 27
 IDPA admits it "does not identify specific nursing homes that are 'efficiently and economically' operated." Illinois Health Care Ass'n, 776 F.Supp. at 419. Nor has the state explicitly defined the terms efficient and economic. Instead, the state argues that the "identification and determination of economically and efficiently operated facilities can be implicit in the rate setting methodology." Brief of Defendant-Appellant at 27.
 
 
 28
 In support of this argument, Defendant points to Folden v. Washington State Department of Social & Health Services, 744 F.Supp. 1507 (W.D.Wash.1990). In this pre-Wilder case, a district court upheld Washington's Medicaid reimbursement rate even though the state had not explicitly identified efficiently and economically operated nursing homes. According to the court, "In Washington's system, rate-setting and the identification of efficiently and economically operated facilities are all part of the same process.... Washington's Medicaid system does what is required by the Amisub opinion, even though the system does it in one step rather than in three separate distinct steps." Id. at 1533.
 
 
 29
 We take the Folden court at its word and will not speculate whether in light of Wilder that court would reach the same judgment. We will, however, examine IDPA's claim that as with its Washington counterpart, "[a] finding identifying and determining efficiently and economically operated facilities is implicit in IDPA's rate-setting methodology." Brief of Defendant-Appellant at 27. This necessarily entails a brief foray into the thorny thickets of Medicaid methodology.
 
 
 30
 As the district court explained in Illinois Health Care, 776 F.Supp. at 415-16, the IDPA reimbursement plan employs a prospective, cost-based, case-mix methodology. In essence, this means the reimbursement rates are based on projections of what the rate is expected to be during a specific period.
 
 
 31
 Three components make up this reimbursement rate--the capital rate, support rate, and nursing rate. Each component is calculated separately for each facility and then combined into a per diem rate which is paid to that facility for each day of nursing home care it provides to Medicaid beneficiaries.
 
 
 32
 The capital rate purports to reimburse providers for ownership and rental costs for buildings and equipment and accounts for a minor portion of the overall reimbursement rate. The support rate is designed to cover costs such as food, laundry, housekeeping, maintenance, insurance, utilities, and office expenses. In calculating this rate, IDPA divides nursing facilities into seven groups and then identifies the 75th percentile for each group. All facilities whose support costs exceed the 75th percentile for their group nonetheless receive only the 75th percentile rate. Why this percentile rate was chosen over some other is not apparent.
 
 
 33
 The third component, the nursing rate, covers direct care costs, including staff salaries, therapy fees, and nursing supply costs. This rate accounts for almost half the total reimbursement rate and most of the controversy in this case. According to IDPA, the nursing rate is comprised of these six elements: variable time reimbursement; training time reimbursement; fixed time reimbursement; fringe benefit reimbursement; reimbursement for allowable costs of supplies, consultants, medical and nursing directors; and reimbursement for therapies. Brief of Defendant-Appellant at 7-8.
 
 
 34
 Of these six elements, the key to determining the nursing rate is the variable time reimbursement. The other five elements are calculated in reference to the variable time calculation. Basically, variable time recognizes that each nursing home resident has individualized needs and abilities; thus the amount of time and skill it takes a nursing home to meet those needs will vary from resident to resident. A nursing home, therefore, is compensated for the time it takes to care for the patients in its facility. This means that two nursing homes with the same number of Medicaid beneficiaries may receive different reimbursements.
 
 
 35
 The variable time calculation starts with an annual survey the IDPA takes of every Medicaid nursing home resident. This survey, or assessment, is designed to classify each resident's medical and personal needs. Depending on a resident's needs in such categories as eating, bathing/grooming, medication monitoring, and injections, a resident is assigned a number from zero to four.
 
 
 36
 For each number in each IDPA-designated category, IDPA assigns a certain amount of time. An example: For a resident who is classified as being totally dependent when it comes to eating, the nursing home is given a total of thirty-nine minutes per day to both prepare and feed that patient--or thirteen minutes per meal (which gives a new meaning to the term "fast food").
 
 
 37
 After the assessments are completed on each Medicaid patient in a nursing home, the total minutes for all categories for all patients in that facility are added up. IDPA then looks at nursing homes' cost reports and computes how much it costs per minute to provide nursing care in that region; this is known as the average regional wage per minute. The accuracy of the methodology for computing this rate is also disputed. Regardless, having determined this rate, the next step is to calculate the average per diem cost of a Medicaid patient. To do so, IDPA (1) multiplies the total number of minutes by the average regional wage per minute, and then (2) divides this figure by the number of Medicaid patients in that facility.
 
 
 38
 Now that the IDPA has calculated what it costs to reimburse a nursing home for each day of caring for an average Medicaid patient, the IDPA takes that per diem cost and using various formulas, tacks on the other five elements to arrive at the total nursing rate. In turn, this nursing rate is added to the support rate and the capital rate to provide the total Medicaid reimbursement rate.
 
 
 39
 Defendant, as mentioned above, claims this methodology implicitly identifies the economic and efficient nursing homes, and thus complies with the Amendment's procedural requirements. The record convinces us otherwise. Looking at the nursing rate, and specifically at the variable time component, we ask where did IDPA get the thirteen-minute meal? Defendant claims the variable time figures were developed in the early 1980s in reference to time and motion studies performed in other states. Yet before the district court and again before our court, Defendant has been unable to produce a copy of those studies. If the studies ever existed, they apparently do not now.
 
 
 40
 IDPA, moreover, over the years has changed the times, added new categories, and redetermined the level of care patients need. These changes were made without apparent reference to the original time and motion studies and IDPA has not conducted new studies in their stead. This is not to say a state must conduct new studies every year; all the Boren Amendment requires is annual findings. See Multicare Medical Center v. Washington, 768 F.Supp. 1349, 1392 (W.D.Wash.1991). Those findings can be based on past studies so long as doing so will result in the accuracy that Wilder demands. See Wilder, 496 U.S. at 514, 110 S.Ct. at 2520. In this case though, there are no extant studies--old or new, on which to base findings.
 
 
 41
 IDPA, as the district court pointed out, does not know if the variable time methodology accurately reflects the amount of time required to efficiently and economically provide for a Medicaid patient. The agency, in addition, has made no finding that the list of needs assessed encompasses the complete range of tasks for which nursing time might be required.
 
 
 42
 The fixed time reimbursement component of the nursing rate is also suspect. This component encompasses time spent that does not vary with resident condition and includes such things as staff meetings, supervision, and checking physicians' orders. IDPA's rate for this component is calculated in reference to the variable time component and together they may not surpass a certain amount. Thus, when variable time in 1983 rose higher than the ceiling, IDPA announced that fixed time reimbursement would be negative for that period. The state Medicaid statute was subsequently amended to prevent fixed time from being a negative number. Yet except for one year, IDPA has set the fixed time reimbursement at zero for both skilled and intermediate care facilities. Fixed time, therefore, is recognized by IDPA as a necessary component of total nursing time but it is not reimbursed.
 
 
 43
 Similar criticism can be leveled at IDPA's support rate. As mentioned earlier, IDPA reimburses nursing homes at the 75th percentile for the support rate. Yet Defendant has made no findings, and presented no evidence, that IDPA found any nexus between its chosen percentiles and the costs of operating an efficient and economical facility. Illinois Health Care, 776 F.Supp. at 419. In other words, IDPA "does not even know whether the method by which it calculates costs reflects actual costs, and by definition it cannot know whether averages or percentiles based on those costs are related in any way to the costs of running an economical and efficient facility." Id. at 420.
 
 
 44
 Without admitting its prior findings were erroneous, IDPA points to two recent studies it commissioned on the profitability of Illinois nursing homes. We agree with IDPA that the timing of the studies is irrelevant; a finding can be based on studies conducted before or during litigation. Moreover, this appeal concerns a declaratory judgment as to the validity of Illinois's plan today. A current study, therefore, could be invaluable. We disagree with IDPA, though, as to the validity of findings based on these studies.
 
 
 45
 Profitability alone is not a gauge to the adequacy of a state's Medicaid reimbursement rate, nor an excuse for noncompliance with the Amendment's procedural requirements. A nursing home, for example, may be profitable because it has a large number of patients who pay their own way. Furthermore, it is not inconceivable that a nursing home may be both profitable and yet not "provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 U.S.C. § 1396a(a)(13)(A). A finding, therefore, that a reimbursement rate is adequate and reasonable merely because a number of nursing homes are profitable does not constitute a finding in compliance with the Amendment.
 
 
 46
 We can envision a situation as in Folden where a rate setting methodology does indeed implicitly determine economical and efficient nursing homes. We cannot envision, however, that Illinois's system falls into this category. Given IDPA's failure to determine what it would consider to be an efficient and economical nursing facility, run in compliance with state and federal regulations, we believe Defendant could not make findings that establish a nexus between the costs of operating such facilities and its reimbursement rates. The state must have reasonable freedom to choose its own methodologies and in particular to define efficient as a relative rather than an absolute concept. The state needs to revisit this difficult area to redetermine for itself the most reasonable and practical means to meet the requirements.V. CONCLUSION
 
 
 47
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 48
 AFFIRMED.